[No. D030732. Fourth Dist., Div. One. Dec. 22 1999.]

RIVERWATCH et al., Plaintiffs and Respondents, v.
COUNTY OF SAN DIEGO, Defendant and Appellant;
PALOMAR AGGREGATES, INC., et al., Real Parties in Interest and
Appellants.

**COUNSEL**

John J. Sansone, County Counsel, Diane Bardsley, Chief Deputy County Counsel, and R. Mark Beesley, Deputy County Counsel, for Defendant and Appellant.

Hall & Associates, Carlyle W. Hall, Jr., Andrew Henderson and Bethany A. Dreyfus for Plaintiffs and Respondents.

Remy, Thomas & Moose, Tina A. Thomas, Andrea A. Matarazzo, Katherine Currie Pittard; Stephenson Worley Garratt, Schwartz, Heidel & Prairie, William J. Schwartz, Jr., and Jennifer Treese Wilson for Real Parties in Interest and Appellants.

**OPINION**

**BENKE, Acting P. J.**—Real parties in interest and appellants Palomar Aggregates, Inc., and William Pankey (collectively Palomar) would like to develop a rock quarry on Rosemary's Mountain in the northeastern portion of San Diego County. After its initial application for a major use permit was opposed by officials of defendant and appellant the County of San Diego (the county), Palomar prepared a revised application, which the county eventually approved. Plaintiff and respondent Riverwatch, an unincorporated association of residents and taxpayers who live near the proposed quarry and respondent Virginia Buonarti, who also lives near the proposed quarry (collectively Riverwatch), then filed a petition for writ of mandate in the superior court challenging the adequacy of the environmental impact report (EIR) that had been approved by the county. The superior court granted the writ and directed the county to vacate its approval of the project. In particular, the court found the county had not sufficiently addressed the impact of a road widening which would be required to accommodate increased truck traffic generated by the quarry. The court also found that the EIR had failed to properly consider the impact of prior illegal activity at the project site and the level of air pollution that would be produced by the quarry.

On appeal, Palomar argues that under a recently enacted clarification of the Permit Steamlining Act (PSA; Gov. Code,[1] § 65920 et seq.) its initial application was approved by operation of law and the time in which that approval could be challenged has passed. Thus Palomar contends the superior court's writ is now moot. In the alternative Palomar argues the superior court abused its discretion in finding the EIR was inadequate.

We reject Palomar's PSA contentions. As we explain, because Palomar asked the county to stop processing its initial EIR, no approval under the PSA occurred. Moreover, even if such an approval had occurred, because no work on the project has occurred, the time in which to challenge the approval has not yet commenced running and thus the substantive issues raised by the project opponents would not under any circumstances be moot.

Nonetheless, we find that, in part at least, the superior court erred in granting the writ. Contrary to the superior court's finding, the final EIR submitted by the appellants provided information which was sufficient to permit the county to consider the impact of the both the quarry and the road widening. The superior court also abused its discretion in requiring that the EIR account for prior illegal activity by using an early baseline from which impacts could be measured. However, like the superior court we find that the EIR did not properly consider the level of air pollution produced by the project.

FACTUAL AND PROCEDURAL SUMMARY

A. *1987 Application for an MUP*

In March 1987 Palomar submitted to the county an application for a major use permit (MUP) that would allow it to operate a rock quarry on Rosemary's Mountain. The project Palomar proposed would have removed the entire top of Rosemary's Mountain by mining approximately 24,000,000 tons of rocks. Because of the heavy truck traffic the quarry would generate, the project would also require the widening of an adjacent two-lane road, State Route 76 (SR 76.) Rosemary's Mountain is located generally east and north of the intersection of SR 76 and Interstate 15 (I-15). In that area SR 76 runs along the northern bank of the San Luis Rey River.

The county determined an EIR would be required for the project and Palomar prepared a draft EIR. On June 10, 1988, a completed draft EIR was released for public comment.

The county received a number of comments objecting to the proposed project. According to Palomar's opening brief, "Palomar quickly recognized

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

that, in order to address the concerns of the County, the public, and other agencies, it had to redesign the Project." At a July 28, 1988, meeting of the county Planning and Environmental Review Board (the PERB), Palomar advised the county that it no longer wished to pursue the project outlined in the EIR. Palomar confirmed its desire in an August 3, 1988, letter to the PERB and the county took no further action with respect to the 1987 MUP application.

### B. *August 1991 Draft EIR*

Between 1988 and 1991 Palomar redesigned its proposed project and in August 1991 the county released a second draft EIR. The August 1991 draft EIR concluded that although many of the significant environmental impacts of the project had been reduced, they had not been eliminated.

The county received a number of comments criticizing the August 1991 draft EIR. In response to the public comments Palomar prepared revisions to the draft EIR, which were released to the public in August 1992. Because the county nonetheless found that a number of environmental impacts of the redesigned project could not be mitigated, the county's planning commission denied Palomar's MUP application in January 1993 and the board of supervisor's denied Palomar's appeal in December 1994.

### C. *1996 EIR*

With the approval of the board of supervisors, Palomar again redesigned the project in an effort to assure the county that the project's negative impacts could be fully mitigated. In April 1996 the county released a third draft EIR prepared by Palomar. By the time the third draft was released the project had been reduced from a quarry that would take the top off Rosemary's Mountain to one that would only take rock from the eastern slope of the mountain.

With respect to SR 76, the draft EIR concluded that the realignment would have a significant impact on the San Luis Rey River floodplain. In particular the draft found that the realignment would increase the degradation of the river channel bed because it would increase the capacity of the riverbed to transport sediment. However, the draft also found that this impact could be successfully mitigated by taking a number of steps to control erosion along the river. The draft EIR also evaluated and rejected an alternative realignment, which would not impact the floodplain. The alternative realignment was rejected because it would require the creation of 300-foot-high slopes, which the draft EIR found to be a significant and unmitigable visual impact.

Like the first two draft EIR's, the third draft attracted a great deal of negative comment from the public and from public agencies. The focus of many of the negative comments was the failure of the draft EIR to fully analyze the impact the realignment of SR 76 would have on the San Luis Rey River floodplain. Caltrans (California Department of Transportation) criticized the manner in which the EIR addressed the highway widening and realignment and disagreed with the draft's proposal for a driveway access from SR 76 to the project. The United States Fish and Wildlife Service and local water districts informed the county that the studies, maps and date used in the draft EIR were out of date and did not accurately reflect hydrological and biological conditions on the floodplain. In particular various water districts criticized the failure of the third draft EIR to include an HEC-2 computer analysis of the floodplain, which the districts believed was necessary to determine the basis for appropriate flood control measures, bank stabilization and installation of new riparian vegetation on any new bank created by the widening.

In response to the criticism of the draft EIR's analysis of the impact of the widening on the floodplain, the county stated no quarry operations would be permitted until the widening of SR 76 had been completed and that the road would not be completed until analysis of the impact of the road alterations had occurred in conjunction with a later application to Caltrans for a permit to encroach on the floodplain. The drafters further concluded that it made little sense to require the developers to bear the cost of conducting an HEC-2 computer analysis before Caltrans had developed final plans for the design of the realignment.

Following consideration of the EIR, the public's comments and its staff's responses, the county's board of supervisor's certified the EIR and granted Palomar a MUP permitting it to operate its quarry.

D. *Trial Court Proceedings*

Riverwatch filed a petition for a writ of mandate that challenged the validity of the final EIR. Riverwatch alleged the EIR did not meet the requirements of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and various land use and zoning regulations.

After considering the briefing submitted by the parties, the superior court granted Riverwatch's petition and directed that the county vacate its approval of the quarry project. The superior court found the final EIR improperly segmented analysis of the impacts of the SR 76 widening by deferring

full consideration of those impacts until Caltrans conducted a review of the widening. The superior court also found the final EIR failed to account for prior illegal and unauthorized activities at the quarry site. Finally, the superior court found the final EIR failed to consider the project's fugitive emissions and haul road emissions.[2]

Palomar and the county both filed timely notices of appeal from the trial court's judgment granting the writ.

## ISSUES ON APPEAL

As we indicated at the outset, Palomar contends that in light of recent amendments to the PSA, in 1988 the county issued it an MUP by operation of law and the permit is no longer subject to judicial review. Because it believes it has the right to operate the quarry, it asks us to reverse the writ and direct the superior court to dismiss Riverwatch's petition as moot.

With respect to the merits of the writ, Palomar and the county contend that, contrary to the superior court's findings, the final EIR adequately analyzes the impact of SR 76, adequately deals with prior illegal activity at the project site, and properly addresses air pollution created by the project.

## DISCUSSION

## I

### Permit Streamlining Act

A. *Automatic Approval*

The PSA requires a public agency to approve or disapprove a development project within one year after an application for a permit is deemed complete. (§ 65950.) In general, if a public agency fails to approve or disapprove a development project within the statutory period, the application will be deemed approved by the agency. (§ 65956, subd. (b).) The purpose of the PSA is "to ensure clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects." (§ 65921.) The goal of the act is to relieve permit applicants from protracted and unjustified delays in processing their permit applications. (*Bickel* v. *City of Piedmont* (1997) 16 Cal.4th 1040, 1046 [68 Cal.Rptr.2d 758, 946 P.2d 427].)

[2]In light of its disposition of the CEQA claims, the superior court deferred ruling on Riverwatch's land use and zoning claims.

By mutual consent of the applicant and the agency, the time in which to act on an application may be extended once for a period of 90 days. (§ 65957.) Our Supreme Court initially found that in addition to the extension expressly provided by section 65957, a project applicant could waive its right to automatic approval by cooperating with an agency's lengthy processing of its application. (*Bickel* v. *City of Piedmont, supra*, 16 Cal.4th at p. 1051.) However, in response to the holding in *Bickel* v. *City of Piedmont*, in 1998 the Legislature amended section 65957. It now provides as follows: "The time limits established by Sections 65950, 65950.1, 65951, and 65952 may be extended once upon mutual written agreement of the project applicant and the public agency for a period not to exceed 90 days from the date of the extension. No other extension, continuance, or waiver of these time limits either by the project applicant or the lead agency shall be permitted, except as provided in this section and Section 65950.1. Failure of the lead agency to act within these time limits may result in the project being deemed approved pursuant to the provisions of subdivision (b) of Section 65956."

In making these amendments to section 65957, the Legislature made the following finding: "The Legislature finds and declares that it is aware of the California Supreme Court's decision in Bickel v. City of Piedmont (1997), 16 Cal.4th 1040 [68 Cal.Rptr.2d 758, 946 P.2d 427]. In enacting this act, it is the intent of the Legislature to clarify that the Permit Streamlining Act (Chapter 4.5 (commencing with Section 65920) of Division 1 of Title 7 of the Government Code) does not provide for the application of the common law doctrine of waiver by either the act's purpose or its statutory language." (Stats. 1998, ch. 283, § 5.)

■ Although the amended version of section 65957 only became effective on January 1, 1999, because on its face it clarified rather than altered the previous provisions of the PSA, Palomar argues that the amended version applies to its initial 1987 application for an MUP. (See *City of Redlands* v. *Sorensen* (1985) 176 Cal.App.3d 202, 211 [221 Cal.Rptr. 728]; *Re-Open Rambla, Inc.* v. *Board of Supervisors* (1995) 39 Cal.App.4th 1499, 1510-1511 [46 Cal.Rptr.2d 822].) In light of the amendment, Palomar argues its 1987 application for an MUP was approved by operation of law.

Notwithstanding the amendments to the PSA, the record discloses two circumstances that prevent us from applying the act's automatic approval provision to Palomar's initial MUP application.

B. *Environmental Exception*

In arguing for strict interpretation of the PSA, which was eventually adopted by the Legislature, Justice Baxter noted in his dissent in *Bickel*:

"The Act has long made provision for the extra time necessary to consider more complex projects which involve significant environmental issues. At the time pertinent here, the Act required final approval or disapproval within six months after 'complet[ion]' of the application in cases involving negative declarations under CEQA, but doubled the decision time to one year if an EIR was required. [Citation.] Since 1983 the Act has also made clear that if an EIR is required, and the time to prepare and certify this document has been extended pursuant to CEQA, the deadline for final approval or disapproval will not run until 90 days after certification of the EIR. [Citation.] Furthermore, the current version of the Act measures *all* time limits for final approval or disapproval in terms of the environmental review process, rather than the date the application was 'complete.' The Act now provides that the project shall be approved or disapproved within 180 days after an EIR is certified, or 60 days after a negative declaration is adopted. [Citation.] CEQA, in turn, allows local agencies to take up to one year after the application is 'complete' to prepare and certify an EIR, and up to one hundred eighty days after the application is 'complete' to prepare and adopt a negative declaration. [Citation.]" (*Bickel* v. *City of Piedmont, supra,* 16 Cal.4th at p. 1056, fn. 2 (dis. opn. of Baxter, J.).)

In particular section 65950.1 states: "Notwithstanding Section 65950, if there has been an extension of time pursuant to Section 21100.2, or 21151.5 of the Public Resources Code to complete and certify the environmental impact report, the lead agency shall approve or disapprove the project within 90 days after certification of the environmental impact report."[3]

With respect to local agencies, Public Resources Code section 21151.5, subdivision (a)(4), provides in pertinent part that by ordinance or resolution the time in which to complete and certify an EIR may be extended "in the event that compelling circumstances justify additional time and the project applicant consents thereto." Under this provision the conduct of an applicant may in fact act as a waiver of CEQA's time requirements. Relying on Public Resources Code section 21151.5, section 15109 of the CEQA Guidelines (Guidelines; Cal. Code Regs, tit. 14, § 15000 et seq.) provides in pertinent part: "An unreasonable delay by an applicant in meeting requests by the lead agency necessary for the preparation of a negative declaration or an EIR shall suspend the running of the time periods [for preparation of a negative declaration or an EIR]."[4]

The waiver of CEQA time limits contemplated in Public Resources Code section 21151.5 and the Guidelines is consistent with the fact that CEQA

---

[3]Contrary to the suggestion in Palomar's letter brief, section 65950.1 has been in effect since 1983. (*Stats.* 1983, ch. 1240, § 1, p. 4861.)

[4]By way of Public Resources Code section 21083, the Legislature expressly authorized the Secretary of the Resources Agency to develop the Guidelines as an aid to agency implemen-

itself contains no automatic approval provisions and its time limits are directory rather than mandatory. (See *Land Waste Management* v. *Contra Costa County Bd. of Supervisors* (1990) 222 Cal.App.3d 950, 961-962 [271 Cal.Rptr. 909]; see also *Sunset Drive Corp.* v. *City of Redlands* (1999) 73 Cal.App.4th 215, 221-222 [86 Cal.Rptr.2d 209].) Indeed, no automatic EIR certification can be implied by way of enactment of the PSA. "[T]he Permit Streamlining Act, which was enacted after CEQA, did not add any automatic approval provision for EIRs, and did not mention EIR certification in the automatic approval provisions which it did set forth. The Legislature must be presumed to have been aware of the CEQA time limits at the time it enacted the Permit Streamlining Act, indicating its tacit intent to leave the law as it stands. [Citations.] In view of the Legislature's failure to enact such a drastic provision, we now decline to read it into CEQA ourselves." (*Land Waste Management* v. *Contra Costa County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 962.)

Here, as we have noted the record discloses processing of the initial EIR was halted at Palomar's request. In light of that request, the county was excused by section 15109 of the Guidelines and Public Resources Code section 21151.5 from its obligation to act on the initial EIR. In turn, under the express terms of section 65950.1, the 90-day period in which the county would have been required to act on Palomar's application never started.

Were we to find that notwithstanding Palomar's abandonment of the initial EIR, the period prescribed by section 65950.1 had nonetheless commenced running we would in effect be imposing on CEQA an automatic EIR verification process that is absent from the face of both CEQA and the PSA. (See *Land Waste Management* v. *Contra Costa County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 962.) Because such an outcome is not dictated by the terms of the respective statutes and is inconsistent with the obvious distinct treatment environmental issues are accorded under the PSA (see *Bickel* v. *City of Piedmont, supra,* 16 Cal.4th at p. 1056, fn. 2 (dis. opn. of Baxter, J.)), we decline to do so.

Because the 90-day limit imposed by section 65950.1 never commenced running, the automatic approval provisions set forth in section 65956 never came into effect.

tation of CEQA. Accordingly they are entitled to great weight and should be respected by the courts unless they are clearly erroneous or unauthorized. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278]; *Fall River Wild Trout Foundation* v. *County of Shasta* (1999) 70 Cal.App.4th 482, 490 [82 Cal.Rptr.2d 705].)

## C. *Opponents' Right to Sue*

■ The second difficulty we have in disposing of Palomar's appeal on the basis that its initial application was approved by operation of law is that, had such approval occurred, the period in which opponents of the project would have to challenge it has not yet commenced to run.

By its terms the PSA only provides project applicants with approval from local agencies. (§ 65956, subd. (b).) It does not prevent opponents of the project from challenging the substantive validity of such approval either by way of appeals to other agencies or by way of an administrative mandamus action. (See *Ciani* v. *San Diego Trust & Savings Bank* (1991) 233 Cal.App.3d 1604, 1616 [285 Cal.Rptr. 699].) As we stated in *Ciani*: "The action necessary for local grant includes hearings and rights of third party appearance, thus providing a procedure for meaningful opposition to the development. Where the permit is obtained by the 'deemed approved' mechanism of the Streamlining Act, the parties in opposition are effectively prevented from presenting a case. If a provision for appeal is appropriate following the hearing and appearance procedures which attend the typical method of permit grant, it would seem even more necessary when considered in light of a 'deemed approved' permit. If appellate rights were considered extinguished as the result of the city's inaction, the city could by such inaction deprive third party contestants of all opportunity to object at a public hearing. We cannot believe this to have been the intent of the Streamlining Act." (*Id*. at p. 1615.)

When a public agency formally approves a project governed by CEQA, it must file a notice of its action with the county clerk. (Pub. Resources Code, § 21152, subd. (a).) The time in which to bring an action challenging such a formal decision runs from the date the agency's decision was made. (Pub. Resources Code, § 21167 subd. (a).) In contrast the time in which to bring a CEQA challenge to a project which has not been the subject of a "formal decision" by a public agency commences when the project commences. (Pub. Resources Code, § 21167, subds. (a), (d); Guidelines, § 15112, subd. (c)(5).) "By providing in section 21167, subdivision (a) that the 180-day limitation period begins to run from the time a project is commenced, the Legislature determined that the initiation of the project provides constructive notice of a possible failure to comply with CEQA. Such a notice is a substitute for the public notification measures set forth in [CEQA]." (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 939 [231 Cal.Rptr. 748, 727 P.2d 1029].)

By definition, any approval of Palomar's project under the PSA would have occurred without a formal decision by the county and accordingly

without any formal notice to opponents of the project. Under these circumstances the time in which to bring a CEQA challenge to Palomar's project, had it been approved under the PSA, would commence when the project commences. (Pub. Resources Code, § 21167; Guidelines, § 15112, subd. (c)(5).) In light of Palomar's abandonment of its initial EIR and its continuing efforts to obtain a formal permit, we believe it is fairly clear that the project has not yet commenced, and thus the period in which opponents of the project would have to challenge the approval has not yet commenced.

In sum then, because the validity of any deemed approval would still be subject to substantive objection on many of the grounds Riverwatch raised to the EIR formally approved by the county, it can hardly be said that any deemed approval would make our review of the judgment Riverwatch obtained in the trial court moot.

## II

## *CEQA*

### A. *The EIR Process*

■ "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' . . .

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.] . . . The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]

"Under CEQA, the public is notified that a draft EIR is being prepared [citations], and the draft EIR is evaluated in light of comments received. [Citation.] The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. [Citation.] The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before

approving the project. [Citation.] Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits. [Citations.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 390-391, fns. omitted (*Laurel Heights*).)

■ "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

### B. *Judicial Review*

"Public Resources Code section 21168.5 sets forth the applicable standard of review. [Citation.] It provides: 'In any action . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA], the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'

■ " '[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA.' [Citation.] The error is prejudicial 'if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]

■ " '[T]he substantial evidence test applies to the court's review of the agency's factual determinations.' [Citation.] Substantial evidence means

'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.] 'In applying the substantial evidence standard, "the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision." ' [Citation.] The appellate court's role 'is precisely the same as the trial court's,' and lower court's findings are not 'conclusive on appeal.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1994) 27 Cal.App.4th 713, 721-722 [32 Cal.Rptr.2d 704] (*San Joaquin Raptor*).)

## C. *SR 76*

 As we have noted the superior court found the EIR approved by the county was defective because it deferred preparation of some environmental analyses until Caltrans has acted on a permit to encroach on the San Luis Rey River floodplain. Palomar argues the EIR does in fact contain all the information needed to evaluate the environmental impact of the widening. We agree with Palomar.

In finding the realignment of SR 76 would have a significant impact on the San Luis Rey River floodplain, the final EIR stated: "The Proposed Project would impact the floodplain and floodway of the San Luis Rey River with the planned relocation of SR-76. The road will be constructed with 2:1 slope adjacent to the SR-76, with riprap slope protection. Willow cuttings would be placed within the riprap as recommended in the Biology section of this report as well as appropriate shrubs and ground cover . . . .

"The proposed realignment of SR-76 affects Segment 1 along the southern project boundary and Segment 2, about 1,000 feet downstream from the project site. Construction of Segment 1 involves the placement of an additional highway lane adjacent to the existing SR-76 roadway and to the elimination of the short radius curve at the entrance to the processing area. Although the revised project proposes to add one lane to the existing SR-76 roadway, the hydrologic impact was evaluated with the addition of two lanes which represents the worst case requirement by Caltrans. The impact from this construction in the floodplain during a 100-year flood event would not change the water surface elevations upstream or downstream. In the vicinity of Segment 1 during a 100-year flood event, flow velocity would increase by approximately 2.66 feet per second and the surface level rise approximately 1.12 feet.

"Within Segment 1, the river is confined by the southern side of Monserate Mountain and northern side of Lancaster Mountain. Therefore, with the

exception of the portion of the floodplain into which the realigned SR-76 would encroach, the boundary of the floodplain would not be altered.

"Segment 2 of the SR-76 realignment would not affect the flow in the San Luis Rey River. This segment would reroute the roadway through a cultivated area which is an ineffective flow zone in the floodplain.

"As a result of the combined impacts of both segments, the sediment transport capacity of the river in the reach adjacent to the proposed realignments would increase from approximately 825 cfs to approximately 900 cfs under the 100-year flood peak discharge. This implies about a nine percent increase in channel bed degradation along the realignment of SR-76.

"All calculations were made assuming that the originally proposed four lane was to be built by the proponent. The new project which proposes a widening to three lanes would further reduce already acceptable impacts as calculated for the four lane proposal.

". . . Impacts to the San Luis Rey River floodplain would be significant and require mitigation . . . ."

In nonetheless concluding the impacts can be mitigated, the final EIR stated: "With the implementation of the following project design elements and mitigation measures, potential hydrological and erosion related impacts will not be significant:

"F-1. Upon relocation of SR-76, riprap bank protection shall be constructed along the south side of SR-76 to the satisfaction of the Department of Public Works and Caltrans consisting of a 30 inch blanket of rip-rap with a median size of 18 inches and a 12 inch layer of gravel filter along the alignment of SR-76.

"F-2. Prior to relocation SR-76, a HEC-2 computer analysis shall be prepared for review by the County Department of Public Works. Provide the basis for appropriate flood control measures regarding flood hydraulics, erosion and sedimentation (as related to the site and adjacent properties); fill bank stabilization and installation of new riparian vegetation on the fill bank for the road. If warranted by HEC-2 analysis, an 18-inch blanket layer of riprap and a 6-inch layer of gravel filter extending from the toe of the bank about 100 feet to the river shall be constructed. If the HEC-2 study shows that the floodplain and/or floodway is located differently than as shown on the County floodplain map . . . , the County and FEMA floodplain maps will be revised."

As we have noted, the final EIR also analyzed an alternative route for the realignment: "The 'Full Highway 76 Widening and Wetland Avoidance Alternative' would realign and widen SR-76 to four lanes between I-15 and past the eastern boundary of the project site, and avoid impacts to the potentially reclaimable least Bell's vireo and willow flycatcher habitat south of the existing SR-76 alignment. Under this project alternative, proposed road improvements would not impact the San Luis Rey River floodplain and, indeed, this would be north of the existing alignment . . . . The project would be modified under this alternative to shift the processing area north.

"Although this alternative would achieve project objectives of profitability, and would avoid wetland impacts to the San Luis Rey River floodplain, it would involve cut and fill slopes ranging up to 300 feet in height resulting in significant and unmitigable visual impacts. These impacts would be so severe that this project is not considered feasible from an environmental perspective and after a preliminary review of this alternative, it was rejected and no additional analysis is warranted."

Riverwatch does not dispute the final EIR's conclusion that the realignment will have a significant impact. Moreover we have found nothing in the record which suggests that the impact cannot be mitigated in the manner described in the final EIR. Admittedly there is a great deal in the record that shows the extent of the mitigation required will depend upon the results of the HEC-2 study. However the fact the entire extent and precise detail of the mitigation that may be required is not known does not undermine the final EIR's conclusion that the impact can in fact be successfully mitigated.

We also note that Riverwatch does not dispute that the alternative considered by the final EIR would create unmitigable visual impacts. Moreover we have found nothing in the record that demonstrates the HEC-2 study or any of the other studies that would be required prior to completion of the realignment would alter this conclusion or materially expand the alternatives that should be considered.

In sum then, on its face the final EIR determined the widening will have a significant impact, requires mitigation which no one disputes will render the impact of the widening insignificant and considers the only feasible alternative route for the widening suggested anywhere in the record. Thus the EIR was sufficient to "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences of the project." (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1454-1455 [263 Cal.Rptr. 340]; see also *Laurel Heights,*

supra, 47 Cal.3d at pp. 391-392; *National Parks & Conservation Assn.* v. *County of Riverside* (1996) 42 Cal.App.4th 1505, 1515 [50 Cal.Rptr.2d 339]; *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 237 [242 Cal.Rptr. 37] (*No Oil*).)

Contrary to Riverwatch's contention, the fact the final EIR deferred until a later point more detailed analysis of the realignment of SR 76 did not violate CEQA. ■ " '[T]he extent to which treatment of a subject in an [environmental document] for a multistage project may be deferred, depends on two factors: (1) whether obtaining more detailed useful information on the topic . . . is "meaningfully possible" at the time when the [environmental document] for an earlier stage is prepared, [citation], and (2) how important it is to have the additional information at an earlier stage in determining whether or not to proceed with the project [citation]. [¶] If the additional information would at best amount to speculation as to future event or events, it obviously would not be of much use as input in deciding whether to proceed. . . . Where the major . . . action under consideration, once authorized, cannot be modified or changed, it may be essential to obtain such information as is available, speculative or not, for whatever it may be worth in deciding whether to make the crystalized commitment . . . . But where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a modification or change after the information is available and incorporated in a further [environmental document], it cannot be said that deferment violates the "rule of reason." Indeed in considering a project of such flexibility, it might be both unwise and unfair not to postpone the decision regarding the next stage until more accurate data is at hand.' [Citation.]" (*No Oil, supra*, 196 Cal.App.3d at pp. 236-237; see also *National Parks & Conservation Assn.* v. *County of Riverside, supra*, 42 Cal.App.4th at p. 1515; *Dry Creek Citizens Coalition* v. *County of Tulare* (1999) 70 Cal.App.4th 20, 35-36 [82 Cal.Rptr.2d 398].)

■ Both the factors set forth in *No Oil* are present here. The record is fairly clear that the additional information that would be provided by Caltrans following its more detailed analysis of the project was unavailable because Caltrans was unwilling to conduct a full-blown study of the realignment until it was certain the quarry would be approved and the county had committed to funding the widening. In turn, the HEC-2 analysis was unavailable because it was impractical to perform it until Caltrans had completed its work. Funding for the widening was not resolved at the time the EIR was prepared because while the county wanted Palomar to pay for 100 percent of the road improvements, Palomar wanted the improvements funded on a fair

share basis, which would impose part of the cost on later developers who would benefit from the improvement.

Riverwatch suggests and apparently the superior court agreed that the funding dispute did not justify any delay in providing the information otherwise available from Caltrans and an HEC-2 study. However we disagree with Riverwatch's unstated premise that because either the county or Palomar could resolve the dispute by accepting financial responsibility for the entire realignment, they had no valid reason to delay obtaining the Caltrans and HEC-2 data.

There is nothing in the record that suggests the financial dispute was anything other than a bona fide disagreement between Palomar and the county. Moreover there is nothing in the record that suggests the unresolved financial issues were anything short of being materially important to both Palomar and the county. Given these circumstances CEQA did not prevent Palomar and the county from deferring resolution of their financial dispute until they could determine that the quarry project, including the highway realignment, would not have an impermissible impact on the environment. (See *No Oil, supra,* 196 Cal.App.3d at p. 237.) Indeed there was a great deal of practicality in the approach adopted by Palomar and the county. If the project could not go forward for environmental reasons, there was no need to resolve the financial issues; by the same token if the project was found to be environmentally acceptable on the basis of available information, that fact would no doubt assist Palomar and the county in resolving their financial dispute.

In this regard the circumstances in this record are similar to the ones considered in *No Oil.* There the project proponent, Occidental Petroleum, wanted to dig exploratory oil wells; if the wells produced oil of a sufficient amount and quality, Occidental would then construct an oil pipeline to transport the oil. Although the EIR for the drilling discussed where pipelines might be located and the public entities from which pipeline permits would be required, project opponents argued that the discussion was insufficient because it did not fully analyze the location and impacts of the contemplated pipeline. In rejecting this argument, the court in *No Oil* stated: "In the case at bench, information presented to the planning and environment committee of City Council, which became part of the administrative record, indicates that until the quantity and quality of the oil extracted during the exploration phase is analyzed, Occidental will not know whether it is financially desirable to proceed with the project, where the oil will be transported, or the specfications of the pipleine to be constructed. Until the oil is analyzed, any in-depth discussion of the proposed pipeline would be mere speculation."

(196 Cal.App.3d at p. 237.) Thus, among other matters, *No Oil* makes it clear that CEQA does not require project proponents to act imprudently or to bear unnecessary investigative and assessment burdens.

Admittedly, where as here deferral is essentially a matter of practicality and efficiency, rather than actual impossibility, the validity of a deferred approach will depend a great deal upon the significance of the information which would be developed later. (*No Oil, supra,* 196 Cal.App.3d at p. 237.) As we have noted, the information that was available permitted the county to conclude the widening would have a significant but mitigable impact on the floodplain and that an alternative route was not acceptable. Although we agree the additional Caltrans data and HEC-2 modeling would be of considerable assistance in designing the precise contours of the realignment and the extent of mitigation, there is nothing in the record that demonstrates that the new information would alter these conclusions.

Importantly, no part of the project will go forward until the realignment has been approved by Caltrans and the road has been constructed. Thus, should new information show that any unmitigable impact of the realignment outweighs the benefits of the project, Caltrans can deny the encroachment permit Palomar must obtain and thereby prevent operation of the quarry. (Cf. *No Oil, supra,* 196 Cal.App.3d at p. 237 [oil pipeline would be subject to further environmental review at the time].) The county was certainly entitled to rely on this additional safeguard in deciding to defer a detailed analysis of the highway realignment. (*Ibid.*)

In this regard the record here is in marked contrast to the ones considered in *San Joaquin Raptor* and *Stanislaus Natural Heritage Project* v. *County of Stanislaus* (1996) 48 Cal.App.4th 182, 203 [55 Cal.Rptr.2d 625] (*Stanislaus Natural Heritage*). In *San Joaquin Raptor* a local agency certified an EIR for a residential development. Although the proposed development would require a substantial expansion of an existing wastewater treatment plant, the EIR for the residential development merely stated that the operator of the treatment plant had agreed to provide service on the condition the developer pay the cost of the expansion. Later the wastewater treatment plant expansion was the subject of an EIR prepared by the operator of the treatment plant. In finding this segmented review process defective, the court stated: " '[O]nly through an accurate view of the project may the public and interested parties and public agencies balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives . . . .' [Citation.] Here, the failure to consider the expansion of the wastewater treatment plant as part of the project under consideration

resulted in an inaccurate project description and incomplete identification and analysis of the environmental effects of the development project. [Citation.]" (*San Joaquin Raptor, supra*, 27 Cal.App.4th at p. 734.)

The court in *Stanislaus National Heritage* reached a similar conclusion about EIR for a residential development which conceded the development would require a new source of water in the area but did not analyze the potential impact of finding and developing the water sources. (*Stanilaus Natural Heritage, supra*, 48 Cal.App.4th at pp. 205-206.)

Here, unlike the EIR's discussed in *San Joaquin Raptor* and *Stanislaus Natural Heritage*, the final EIR did in fact consider both the impact of the quarry and SR-76 and provided the decision makers with the information they needed to make an informed decision about the entire project. (See *Dry Creek Citizens Coalition* v. *County of Tulare, supra*, 70 Cal.App.4th at pp. 35-36.)

In sum then, we find that the final EIR included all the information needed to evaluate the impact of the realignment of SR 76 as part of the quarry project and that the superior court abused its discretion in requiring more detailed analysis of the widening.

### D. *Biological Resources*

 In evaluating the impact of the quarry project on the biological resources on the project site, as well as on areas in the vicinity of the project, the 1996 draft EIR noted that one area on the site of the project would have been a good riparian habitat had it not been previously used as a sand mine. The draft EIR stated: "The value of the narrow riparian strip on-site is diminished since it is a small island of highly disturbed habitat. If it had not been used as a sand mine, the area in the river below would be much more significant because it could support riparian vegetation, and ultimately sensitive species such as the vireo and the arroyo toad. The river channel represents an example of why this habitat is sensitive. Riparian habitats by their nature are limited in Southern California and have rapidly been lost to flood control and other modifications over the last fifty years."

The draft EIR made a similar analysis of an area south of the quarry site: "All of the approximately 13.1 acres of potential vireo habitat directly south of the site that may be indirectly impacted by noise occurs within designated vireo habitat. However, no vireos or flycatchers have been reported in the immediate project vicinity, likely because the area has been cleared and/or is disturbed. Therefore, no vireos would be impacted in the vicinity of the project by noise generated by project operations."

In response to this analysis in the draft EIR a number of commentators pointed out that the degraded condition of the described sites was caused by

the unlawful and unauthorized activity of Palomar's owners or predecessors in interest. Comments from citizens indicated the sand mining operation on the site of the quarry had been halted by the Army Corps of Engineers and was subject to a revegetation program.

The Fish and Wildlife Service stated: "The assessment of the resource value of the floodplain south of the existing State Route 76 alignment did not account for the potential resource value of the area that would have existed if it were not for the unauthorized discing of the area by the applicant (Department of Army, Corps of Engineers, 1996; attachment 1.) The Service recommends that resolution of the Notice of Violation of the Clean Water Act be reached prior to any decision regarding the proposed project. In addition, the cumulative effects analysis should include a discussion on unauthorized activities in the vicinity that have degraded the San Luis Rey River." The Fish and Wildlife Service believed that: "The description of the existing condition of the vegetation in the San Luis Rey River should include a summary of how much of the area was cleared through unauthorized activities."

In its response to these comments, the final EIR made the following statement with respect to the sand mining area: "The status of the J. W. Sand mining operation and the required reclamation for that project, while understandably of interest to local property owners, are not issues pertinent to the environmental review of the proposed quarry operations addressed in this EIR." In addition the final EIR made the following comments with respect to the disced area adjacent to the San Luis Rey River: "The disced area referred to in the comment has been in agricultural use for several years. Over the approximately 12 years during which the proposed project and its predecessors have been under study, the area of concern has always been in the same disturbed condition as at present. No portion of the project site or activities occurring on the project site are *currently* in violation of federal law. . . ."

"The DEIR describes existing conditions in the project area, as required under CEQA. How those conditions came to exist, and whether the past actions of third parties were properly authorized, may be of interest to resource agencies for enforcement actions but are not pertinent to the proposed project."

The superior court did not believe the final EIR's response to the concerns raised by the public and the Fish and Wildlife Service were adequate. The superior court found that the EIR should have developed an environmental baseline which accounted for the prior illegal activity both on the quarry project and off site. We disagree with the superior court. We believe that in general preparation of an EIR is not the appropriate forum for determining the nature and consequences of prior conduct of a project applicant.

First, we note the generally accepted principle that environmental impacts should be examined in light of the environment as it exists when a project is approved. (Guidelines, § 15125, subd. (a); *Bloom* v. *McGurk* (1994) 26 Cal.App.4th 1307, 1315, fn. 2 [31 Cal.Rptr.2d 914]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 246 [227 Cal.Rptr. 899]; *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 190 [228 Cal.Rptr. 868]; *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [182 Cal.Rptr. 317]; Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 165.) This general rule is of course not insurmountable. Indeed, Palomar concedes that prior illegal activities cannot be entirely ignored.

The real difficulty we see in requiring the development of early baselines is the burden it would impose on drafters in determining the nature of any prior illegality. Here, both the former sand mine at the site of the quarry and disced land off site were the subject of enforcement actions by the Army Corps of Engineers and the county contacted the corps with respect to the EIR. The corps confirmed that those sites were currently in compliance with federal law; importantly the corps did not indicate that certification of the EIR would in any manner interfere with its enforcement actions with respect to prior activity.

Thus, a particular problem we foresee in requiring an earlier baseline is that definitive evidence of prior illegality will most likely come in the form of the acts of enforcing agencies and that use of an early baseline by a separate agency preparing an EIR may either interfere, conflict or unfairly amplify such enforcement action.

In the absence of more detailed guidance either from the Legislature or the Resources Secretary, we believe a more prudent method of dealing with alleged prior illegality is to rely in the first instance on direct enforcement by the agencies charged with the responsibility of doing so, and second, to rely on such enforcing agencies to comment in the EIR process on the impact any new project may have on their enforcement activities. Because the prior illegality was subject to enforcement actions and the enforcing agency participated in the CEQA process, CEQA did not require any further accounting for prior activity at or within the vicinity of the project.

### E. *Air Pollution*

 When air pollution from a project meets an existing local standard for a particulate pollutant, under Guideline section 15064, subdivision (i),[5] the agency responsible for preparing an EIR may presume that air pollution is not significant.

---

[5]At the time the EIR was drafted, section 15064, subdivision (i) of the Guidelines provided: "If an air emission or water discharge meets the existing standard for a particular pollutant,

The final EIR concluded that the quarry project would produce a daily total of 288.8 pounds of particulate dust, known as PM10. Ninety-five pounds of the PM10 would be produced by the quarry processing itself (processing emissions); 82.7 pounds of PM10 would be produced by drilling, quarry handling and wind erosion of stockpiled rock and sand (fugitive emissions); and 111.1 pounds would be produced by way of hauling aggregate to and from the processing plant (haul road emissions). The final EIR concluded this level of air pollution was not significant because the county believed these levels of pollution met the applicable air pollution standard set by the San Diego Air Pollution Control District (APCD).

The difficulty with the EIR's conclusion is that only the process emissions from the quarry were the subject of an APCD prohibitive standard. While the process emissions met the APCD process emission standard of 100 pounds of PM10, that fact did not permit the drafters of the EIR to presume that the other almost 200 pounds of PM10 was insignificant or that together the process emissions and the fugitive and road haul emissions were insignificant. (See *Kings County Farm Bureau* v. *City of Hanford* (1990) 221

---

the lead agency may presume that the emission or discharge of the pollutant will not be a significant effect on the environment. If other information is presented suggesting that the emission or discharge may cause a significant effect, the lead agency shall evaluate the effect and decide whether it may be significant." (Cal. Reg. Notice Register 97, No. 22.) Recently, section 15064, subdivision (i), was amended, relettered, and now provides as follows:

"(h)(1)(A) Except as otherwise required by Section 15065, a change in the environment is not a significant effect if the change complies with a standard that meets the definition in subsection (i)(3).

"(B) If there is a conflict between standards, the lead agency shall determine which standard is appropriate for purposes of this subsection based upon substantial evidence in light of the whole record.

"(C) Notwithstanding subsection (i)(1)(A), if the lead determines on the basis of substantial evidence in light of the whole record that a standard is inappropriate to determine the significance of an effect for a particular project, the lead agency shall determine whether the effect may be significant as otherwise required by this section, Section 15065, and the Guidelines.

"(2) In the absence of a standard that satisfied subsection (i)(1)(A), the lead agency shall determine whether the effect may be significant as otherwise required by this section, Section 15065, and the Guidelines.

"(3) For the purposes of this subsection a 'standard' means a standard of general application that is all of the following:

"(A) a quantitative, qualitative or performance requirement found in a statute, ordinance, resolution, rule, regulation, order, or other standard of general application;

"(B) adopted for the purpose of environmental protection;

"(C) adopted by a public agency through a public review process to implement, interpret, or make specific the law enforced or administered by the public agency;

"(D) one that governs the same environmental effect which the change in the environment is impacting; and,

"(E) one that governs within jurisdiction where the project is located.

"(4) This definition includes thresholds of significance adopted by lead agencies which meet the requirements of this subsection."

Cal.App.3d 692, 716-717 [270 Cal.Rptr. 650].) As the court in *Kings County* stated in rejecting a similar reliance on a local air pollution control district's PM10 standard, "[The district's] rules and standards are designed to measure pollution emissions from more narrowly drawn sources, i.e., stationary sources. Thus [the district] requires the division of a project into parts for purposes of review. CEQA, on the other hand, is designed to measure all project-related pollution emissions and prohibits the division of a project into parts for purposes of environmental review." (*Id.* at p. 716.)

We agree with Palomar that in addition to a prohibitive standard for process emissions of PM10, the APCD has a much lower standard, which triggers a requirement for the use of the best available current technology (BACT) for nonstationary sources of PM10, such as fugitive emissions and haul road emissions. However the BACT standard for such sources of PM10, 10 pounds a day, only requires that a user employ certain technology; the standard does not in any manner suggest what the APCD believes is a significant level of pollution. Thus, unlike a prohibitive standard, such as the one for process emissions, the BACT standard cannot be relied upon in establishing the significance or insignificance of a given level of emissions.

Thus we agree with the superior court that the final EIR did not properly evaluate the significance of air pollution created by the quarry.

F. *Land Use Regulations*

In light of its disposition of the CEQA issues, the superior court did not reach the land use and zoning violations alleged by Riverwatch. In light of the defect we have found in the final EIR, we too find no useful purpose in considering Riverwatch's additional claims at this point.

DISPOSITION

The judgment granting Riverwatch's petition is reversed insofar as it requires the county to more fully consider the realignment of SR 76 and develop a baseline which considers alleged unlawful uses at or in the vicinity of the project. In all other respects the judgment is affirmed.

Each party to bear its own costs of appeal.

Haller, J., and O'Rourke, J., concurred.

On January 12, 2000, the opinion was modified to read as printed above.