[No. A060989. First Dist., Div. Four. July 21, 1994.]

STEVE BLOOM, Plaintiff and Appellant, v.
JACK S. McGURK, as Chief, etc., Defendant and Respondent;
INTEGRATED ENVIRONMENTAL SYSTEMS, INC., Real Party in
Interest and Respondent.

## COUNSEL

Steve Bloom, in pro. per., for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Charles G. Holland III, Assistant Attorney General, Stephanie Wald and Elizabeth Edwards, Deputy Attorneys General, for Defendant and Respondent.

Graham & James, Jennifer Hernandez and Michael E. Sobel for Real Party in Interest and Respondent.

## OPINION

**PERLEY, J.**—Steve Bloom appeals from the judgment denying his petition for a writ of mandate to compel the California Department of Health Services (Department) to set aside the permits it issued in October of 1992 to Integrated Environmental Systems (IES) for continued operation of a medical waste treatment facility. We affirm.

### I. *Background*

The facility has operated at 499 High Street in Oakland, in an area west of the 880 freeway zoned for heavy industry, since 1982. In 1985, the company was sold and its name was changed to IES. Since at least March of 1986, IES has run two incinerators with a combined capacity of one ton per hour with permits issued by the Bay Area Air Quality Management District. The

facility receives wastewater discharge permits from the East Bay Municipal Utilities District, and IES is registered with the state as a transporter of hazardous waste. In 1987, the Department's Toxic Substances Control Division accepted IES's application for continued operation as a hazardous waste facility. In October of 1990, the Department's Environmental Health Division approved IES's use of a microwave disinfection unit in addition to the incinerators.

In 1990, the Legislature enacted the Medical Waste Management Act (Health & Saf. Code, § 25015 et seq. [MWMA]; Stats. 1990, chs. 1613, 1614), to create "a single, integrated, and complementary approach to the storage, treatment, transportation, and disposal of medical waste" (Stats. 1990, ch. 1614). Effective January 1, 1991, the MWMA required a generator of 200 or more pounds of medical waste a month to obtain a medical waste permit. (Health & Saf. Code, §§ 25022.8, 25050, subd. (a).) Entities like IES which had been licensed under the hazardous waste law were deemed under the MWMA to have a medical waste permit until January 1, 1992. (Health & Saf. Code, § 25071, subd. (b).) In November and December of 1991, IES submitted permit applications for its incinerators and microwave unit to the Department's medical waste management program. The Department extended IES's permit under the MWMA beyond January 1, 1992, until its review of IES's applications was completed.

Regulations under the MWMA require permit applicants to submit information necessary to enable the Department to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. [CEQA]). This information may include inter alia "evidence deemed acceptable by the [Department] of . . . compliance with the requirements of CEQA." (Cal. Code Regs., tit. 22, § 65610, subd. (a)(1)(A).) The applications herein stated in relevant part that IES "is an existing facility. Continuation of existing operations is Categorically Exempt (Class I) from [CEQA] under Section 15301 of the State CEQA Guidelines."

After receiving IES's applications, the Department's medical waste management program contacted the Oakland Planning Department. The Oakland Planning Department advised that it had not undertaken an "environmental review" of the IES facility, and that any such review would have been conducted by the Port of Oakland. The Department then informed IES that additional information might be necessary "to complete the [CEQA] approval process," and suggested that IES contact the Oakland Port Authority for any information it might have "relative to CEQA approval." The port authority told IES that it had not issued any "permits or other discretionary

approvals" for the facility. IES confirmed that its use was authorized under applicable zoning regulations, and reported to the Department that "[t]he only discretion exists with Bay Area Air Quality Management District (BAAQMD) which has continually permitted our facility."

IES outlined the history of the facility's regulatory approvals in a letter to the Department dated June 16, 1992. IES stated that no permit from the Oakland Port Authority or conditional use permit had been required when the facility was established in 1982. There is no indication in the June 16 letter or elsewhere in the record that an environmental impact report (EIR) or negative declaration has ever been prepared for the facility.

On June 25, 1992, the Department filed a notice that the issuance of medical waste permits to IES was exempt from CEQA. Under the heading "Exempt Status," the Department put an "X" next to the word "Ministerial." The Department added that the project was categorically exempt under classes 1 and 8 of the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq. [CEQA Guidelines]; see Cal. Code Regs., tit. 14, § 15301 [class 1 exemption for existing facilities] and § 15308 [class 8 exemption for actions by regulatory agencies to protect the environment].) With respect to the class 1 "existing facilities" exemption, the Department stated that " 'This project involves only the continued operation of existing private facilities and mechanical equipment. No changes to the facility, equipment, or topography is proposed as part of this permit application.' "

Appellant wrote a letter to the Department on July 29, 1992, contesting the notice of exemption, and filed his petition for writ of mandate the next day. The Department proceeded to issue medical waste permits to IES on October 20, 1992. The court denied appellant's petition in January of 1993, concluding that substantial evidence supported the Department's CEQA determination, and that appellant had "failed to meet his burden of proving a prejudicial abuse of discretion by [the Department]."

## II. DISCUSSION

### A. *The Class 1 Categorical Exemption*

■ Appellant contends that issuance of the medical waste permits was not exempt from CEQA because IES's facility has never been the subject of an EIR or a negative declaration. The facility was established in 1982, and the record contains no evidence of any significant change in its operations thereafter apart from addition of the microwave unit in 1990. In these circumstances, we conclude that the categorical exemption for "existing facilities" was correctly applied in connection with the 1992 permits.

The "project" in this case is the ongoing operation of a medical waste treatment facility under a new regulatory scheme. (See generally, CEQA Guidelines, § 15378, subd. (a)(3); *Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 664 [124 Cal.Rptr. 635].) Since IES was deemed to have permits under the MWMA for the first year following the law's effective date, the regulatory approvals at issue are permit renewals.

The first category of projects exempted from CEQA under the CEQA Guidelines are those "consist[ing] of the *operation*, repair, maintenance, or minor alteration *of existing* public or *private* structures, *facilities*, mechanical equipment, or topographical features, *involving* negligible or *no expansion of use beyond that previously existing.*" (CEQA Guidelines, § 15301, italics added.) Since it is undisputed that there was no change in IES's operations incident to renewal of the medical waste permit, the project falls squarely within the highlighted language of the class 1 categorical exemption. However, the CEQA Guidelines further provide that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (CEQA Guidelines, § 15300.2, subd. (c).) Appellant argues that renewal of IES's permits is within this exception, and thus that none of the categorical exemptions applies. This argument is based primarily on the Third Appellate District's decision in *Lewis* v. *Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823 [211 Cal.Rptr. 884].

*Lewis* involved auto racing at a county fairground, which was described as "contiguous with and less than a mile from several residential areas."(*Lewis* v. *Seventeenth Dist. Agricultural Assn.*, *supra*, 165 Cal.App.3d at p. 826.) The racetrack was constructed in 1958, and modified in 1973 to permit racing by higher powered cars. A racing association leased the facility from the district association for races from 1973-1980. Local residents complaining about noise and dust sued in 1980 to halt further racing pending completion of an EIR. The district filed a notice that its 1981-1983 contract with the racing association was categorically exempt from CEQA under the class 23 "public facilities" exemption.[1] However, the appellate court concluded that the exemption did not apply because the activity was within the exception for "significant effects on the environment due to unusual circumstances." (*Id.*, at pp. 828-831.)

---

[1]At the time, the class 23 exemption extended in relevant part to " 'the normal operations of existing facilities for public gatherings for which the facilities were designed, where there is a past history of the facility being used for the same kind of purpose. Facilities included within this exemption include, but are not limited to, racetracks . . . .' " (*Lewis* v. *Seventeenth Dist. Agricultural Assn.*, *supra*, 165 Cal.App.3d at p. 828, fn. 4.)

CEQA defines "'significant effect on the environment'" to mean "a substantial, or potentially substantial, adverse *change* in the environment." (Pub. Resources Code, § 21068, italics added; see also CEQA Guidelines, § 15382.) The panel in *Lewis* concluded that, for purposes of the categorical exemptions, "change" in the environment meant a change after 1970, when CEQA was enacted. (*Lewis* v. *Seventeenth Dist. Agricultural Assn., supra,* 165 Cal.App.3d at p. 829; see also *id.,* at p. 838 (conc. opn. of Blease, J).) Thus, continued racing in 1981-1983 could be deemed to have a "significant effect" on the environment because the environment had been "changed" when the racetrack was modified back in 1973.

This aspect of *Lewis* does not appear to have been applied outside the Third Appellate District. The Third District cited *Lewis* in *Campbell* v. *Third Dist. Agricultural Assn.* (1987) 195 Cal.App.3d 115 [240 Cal.Rptr. 481], another case that involved auto racing at county fairgrounds adjacent to a residential area. The racetrack in *Campbell* was constructed before the enactment of CEQA, but unlike the racetrack in *Lewis,* it was not modified or operated thereafter so as to effect any adverse change in the post-CEQA environment. The court distinguished *Lewis* on this ground, and concluded that continued operation of the racetrack in 1986 was categorically exempt from CEQA. (*Id.,* at p. 118-119.)

The Third District also alluded to *Lewis* in *Committee for a Progressive Gilroy* v. *State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847 [237 Cal.Rptr. 723], a case involving a sewage treatment plant expanded in the mid-1970's. An EIR was completed in connection with the expansion, covering a projected capacity of 6.4 million gallons per day (mgd). The facility was licensed in 1981 to handle 6.1 mgd, but in January of 1984, after operating problems arose, its authorized capacity was reduced to 5.15 mgd. In November 1984 the authorized capacity was increased to 5.3 mgd, and in May 1985 the authorized capacity was restored to 6.1 mgd.

*Gilroy* held that an EIR was not required in connection with the 1984 and 1985 capacity increases, because the "project" for CEQA purposes was expansion of the plant, and an EIR had already been completed for that project. (See Pub. Resources Code, § 21166 [no supplemental EIR is required absent substantial changes or new information].) Although this reasoning was dispositive, the court went on to state that the class 1 existing facilities exemption also applied. The opinion reads in pertinent part: "Since the project was originally built and approved for 6.1 mgd in full compliance with CEQA, the order restoring that capacity related to an existing facility and was exempt from CEQA." (*Committee for a Progressive Gilroy* v. *State Water Resources Control Bd., supra,* 192 Cal.App.3d at p. 864.) This dicta

suggests that a facility does not "exist" within the meaning of the class 1 exemption unless it predates the enactment of CEQA, or was originally implemented in compliance with CEQA.

Appellant notes that the logic of *Lewis* and *Gilroy* could be extended to IES's facility because it was not operated before 1970, and has not been the subject of an EIR or a negative declaration. Under *Lewis*, the environment would be deemed to have "changed" when the facility began operating in 1982, and because of that "change," renewal of IES's permits in 1992 might not be categorically exempt from CEQA, even though IES has not altered its operations since addition of the microwave unit in 1990. Under *Gilroy*, IES's facility would not "exist" for purposes of the class 1 exemption.

Appellant submits that a contrary interpretation of the class 1 exemption "would amount to an invitation for facilities like IES to evade CEQA by beginning operation illegally and only later obtaining the necessary permit(s) for operation." In appellant's view, that prospect does not comport with the mandate that CEQA be construed "so as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

However, as respondents point out, it would derogate the brief statutes of limitation for challenges to agency actions under CEQA to construe the class 1 exemption so as to make a facility established in 1971, and operated without any change thereafter, initially subject to CEQA by renewal of a permit in 1994. (See Pub. Resources Code, § 21167 [setting deadlines from 30 to 180 days]; CEQA Guidelines, § 15112, subd. (a) [noting that CEQA's statutes of limitation are "unusually short"]; see also, e.g., *Lee* v. *Lost Hills Water Dist.* (1978) 78 Cal.App.3d 630, 633-634 [144 Cal.Rptr. 510] [strictly construing the 30-day limitation period under Pub. Resources Code, § 21167, subd. (b)].) The time to contest approvals for the establishment of IES's facility in 1982 or the addition of the microwave unit in 1990 had expired long before the filing of appellant's petition.

As the Department observes, *Lewis* and *Gilroy* have also been called into question by the Supreme Court's reasoning in *Napa Valley Wine Train, Inc.* v. *Public Utilities Com.* (1990) 50 Cal.3d 370 [267 Cal.Rptr. 569, 787 P.2d 976]. *Wine Train* held that the proposed operation of a tourist train was exempt from CEQA under a statutory exemption for passenger service on railroad rights of way "already in use." (Pub. Resources Code, § 21080, subd. (b).) Although the court was divided on this ultimate question, all of the justices agreed that "the time at which the exemption logically operates

is the time at which the responsible agency must determine whether or not to require the affected person to file an environmental impact report." (*Napa Valley Wine Train, Inc.* v. *Public Utilities Com., supra*, at p. 378, fn. 12; see also *id.*, at pp. 391-392 (dis. opn. of Kaufman, J.).)[2]

Under *Wine Train*'s analysis, the term "existing facility" in the class 1 exemption would mean a facility as it exists at the time of the agency's determination, rather than a facility existing at the time CEQA was enacted. For purposes of the exception to the categorical exemptions, "significant effect on the environment" would mean a change in the environment existing at the time of the agency's determination, rather than a change in the environment that existed when CEQA was enacted.

We adopt the foregoing interpretations, decline to apply the dicta in *Gilroy* as to when a facility may be said to "exist," and decline to follow *Lewis*'s definition of a "change" in the environment. We presume that thousands of permits are renewed each year for the ongoing operation of regulated facilities, and we discern no legislative or regulatory directive to make each such renewal an occasion to examine past CEQA compliance at every facility built in the last 24 years. That result would contravene the applicable statutes of limitation and the ordinary meaning of the words used in the class 1 exemption.[3]

The result in *Lewis* is distinguishable in any event. The exception for "significant effect[s] on the environment" under section 15300.2, subdivision (c) of the CEQA Guidelines does not apply unless those changes are "due to unusual circumstances," and appellant has neither cited nor produced substantial evidence of any "unusual circumstances" in this case. (See *Association for Protection etc. Values* v. *City of Ukiah* (1991) 2 Cal.App.4th 720, 728, 736 [3 Cal.Rptr.2d 488].)

*Lewis* stated simply that there was "no question of the existence of unusual circumstances—the adjacency of residential areas to the racetrack." (*Lewis* v. *Seventeenth Dist. Agricultural Assn., supra*, 165 Cal.App.3d at p. 829.) Appellant states that there are likewise residential areas adjacent to

---

[2]Legislative abrogation of the result in *Wine Train* (Pub. Resources Code, § 21080.04) was not tantamount to disapproval of the court's unanimous reasoning on this point.

[3]Our conclusion is also consistent with cases that have required potential impacts to be examined in light of the environment as it exists when a project is approved. "In assessing the impact of [a] rezoning, it is only logical that the local agency examine the potential impact on the existing physical environment." (*City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 246 [227 Cal.Rptr. 899]; see also *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 190 [228 Cal.Rptr. 868]; *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [182 Cal.Rptr. 317].)

IES's facility. However, the facility is in an area zoned for heavy industry, there are apparently no homes in the immediate vicinity, and IES's operations are comparable to those of surrounding businesses. According to the record, "[i]mmediate neighboring land uses include truck body manufacture and repair, awning manufacture, lumberyard, container storage, warehousing, and a fire sprinkler manufacturer. Nearby uses include a petrochemical processing plant and glass making facility." The presence of comparable facilities in the immediate area adequately supports the Department's implied finding that there were no "unusual circumstances" precluding a categorical exemption in this case. (See *City of Pasadena* v. *State of California* (1993) 14 Cal.App.4th 810, 826-827 [17 Cal.Rptr.2d 766].)

Renewal of IES's medical waste permits was therefore exempt from CEQA under the class 1 categorical exemption for existing facilities.[4]

## B.  *Expansion of Permitted Capacity*

■   Appellant's additional contention is that an EIR was required under Public Resources Code section 21151.1, subdivision (a)(1)(A)(ii) for renewal of the permit for IES's incinerators. This statute states that an EIR is necessary for any project involving "[t]he expansion of an existing facility which burns hazardous waste which would increase its permitted capacity by more than 10 percent." This limitation evidently applies to facilities like IES that burn "medical waste," even though the MWMA (Health & Saf. Code, § 25117.5, subd. (a)) has excepted "medical waste" from the "hazardous waste" control statutes. (See Pub. Resources Code, § 21151.1, subd. (c)(10) [exempting certain other facilities burning medical waste from the provisions of subd. (a)(1) of the statute].) Appellant's theory is that the "permitted capacity" of the incinerators was only 6,000 tons annually when IES was licensed as a hazardous waste facility, and that this permitted capacity was increased to 8,640 tons annually when IES was licensed as a medical waste facility. However, this theory lacks merit because IES's facility was not expanded incident to issuance of the medical waste permits, and the record does not establish that there has been any increase in the "permitted capacity" of the facility's incinerators.

There is no evidence of any increase in the capacity of the incinerators, or their actual or authorized use, from 1987 when IES was licensed to operate as a hazardous waste facility, and 1991, when it was licensed to operate as a

---

[4]In view of this conclusion, we do not address whether renewal of the permits was exempt as an action to protect the environment within the meaning of the class 8 categorical exemption, or as a merely "ministerial" act by the Department (see *Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 845 [171 Cal.Rptr. 753]).

medical waste facility. The operation plans submitted in connection with IES's 1987 and 1991 applications to the Department both state that the incinerators have a combined capacity of one ton per hour. Due in part to addition of the microwave unit, it appears that the incinerators handled substantially less waste in 1991 than in 1987. The 1987 and 1991 applications estimated the annual quantity of waste processed by the incinerators to be 6,000 and 3,000 tons, respectively. The medical waste permit for the incinerators states that IES is permitted to process up to 8,640 tons per year, based on the capacity of the incinerators. The terms of IES's approval to operate as a hazardous waste facility did not specify any limit on the amount of waste incinerated. Hence there has been no increase in the "permitted capacity" of the incinerators that would require an EIR.

## III. Disposition

The judgment is affirmed. The parties shall bear their own costs on appeal.

Anderson, P. J., and Reardon, J., concurred.