[No. C037610. Third Dist. Apr. 4, 2002.]

KENNETH F. FAT et al., Plaintiffs and Respondents, v.
COUNTY OF SACRAMENTO, Defendant and Appellant;
SUNSET SKYRANCH PILOTS ASSOCIATION et al., Real Parties in
Interest and Respondent.

1272

**COUNSEL**

Robert A. Ryan, Jr., County Counsel, and Diane E. McElhern, Deputy County Counsel, for Defendant and Appellant.

Gabrielli Law Office and John C. Gabrielli for Plaintiffs and Respondents.

No appearance for Real Parties in Interest and Respondents.

**OPINION**

**CALLAHAN, J.**—Defendant County of Sacramento (County) approved a negative declaration and conditional use permit allowing real parties in interest Sunset Skyranch Pilots Association and Daniel Lang (collectively the Pilots) to operate and expand Sunset Skyranch Airport (Airport) in Elk Grove. Plaintiffs Kenneth F. Fat and Wing K. Fat (collectively the Fats) filed a petition for writ of mandate to set aside County's actions on grounds it failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA).[1] The court granted the petition, and County appeals.

The sole issue is whether County abused its discretion in using the physical conditions that existed in 1997 as the baseline for deciding whether

---

[1] Undesignated statutory references are to the Public Resources Code.

the proposed project would result in significant environmental impacts.[2] We conclude County proceeded in the manner required by law, and therefore reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Airport has operated as a privately owned public facility since 1934. Lang acquired the property in 1971 when it "consisted only of a dirt strip, one hangar, and four to five airplanes . . . ."

In 1971, the board of supervisors approved a conditional use permit (CUP) for "a private use airstrip and ancillary uses" for a term of two years. A 1972 amendment to the county general plan showed a public use airport on the property. The CUP expired in 1973, and was not renewed. However, Airport continued to expand without County authorization.

In 1972, the California Department of Transportation Aeronautics Division issued state airport permit No. 34-19 allowing airport operations on the property. The permit has been active continuously since that date.

The Airport Land Use Commission of Sacramento, Sutter, Yolo, and Yuba Counties (ALUC) adopted the Sunset Skyranch Airport Comprehensive Land Use Plan (CLUP) in 1988. The ALUC declared the project exempt from CEQA review after it concluded the CLUP would not have a significant effect on the environment. No one challenged the claimed exemption.

The County denied Airport a business license in 1989. Thereafter, on February 20, 1990, the planning director denied Airport's request for a certificate of nonconforming use, and indicated that "the proper administrative procedure to bring the business into conformance would be to obtain a conditional use permit from the appropriate authority . . . ." County initiated two zoning enforcement actions to require Airport to obtain a CUP.

The ALUC amended the Airport CLUP in 1992 "by adopting Land Use Compatibility Guidelines that minimize[d] the public's exposure to noise and safety hazards." The amended CLUP described the facilities as they existed in 1992: "The airport's single paved runway is 2,780 feet long by 35 feet wide . . . . A parallel 1,900 by 25 foot gravel ultralight runway also exists. [¶] A total of 71 aircraft are currently based at Sunset Skyranch. The

---

[2] The Fats frame the issue differently, arguing that the *trial court* acted within its discretion in adopting the earlier baseline. As we shall explain, both the trial courts and appellate courts review the administrative record to determine whether the *agency* abused its discretion. (§ 21168.)

airport has 53 open tie-downs, 22 T-hangars, and 7 transient parking spaces. Two fixed-based operators, a flight school, and limited maintenance services exist. Ultralights operator [*sic*] on the airport. Fuel is available only to flight school members. . . . [¶] Annual operations are estimated to be 30,000. The theoretical runway capacity is estimated to be 130,000 annual operations. Because touch-and-go operations are restricted, the airport serves primarily as an aircraft parking facility." The ALUC adopted a negative declaration as part of the 1992 amendment process, and determined that "the project, without any mitigation measures, [would] not have a significant effect on the environment." It circulated the negative declaration for public comment, and no one challenged its adoption.

The Pilots applied for a CUP in October 1997 to authorize airport operations in the AG-80 and AG-80(F) zones. An attachment to the application stated they were "attempting to resolve a long running dispute with various agencies of Sacramento County over the legal status of Sunset Skyranch airport. [¶] Thr[ough] negotiations with the county, [the Pilots have] agreed to apply for a special use permit for the airport to continue to operate." The Pilots' stated goals were to (1) secure the long-term right to continue operations as an airport; (2) acquire building permits for the existing structures; and (3) obtain permission to convert existing aircraft parking areas to hangars.

The initial study briefly described the environmental setting. It indicated that the proposed site improvements involved construction of approximately 24 additional hangars "most likely . . . limited to minor grading to accommodate concrete pads." Additional minor grading might be needed to create a level taxi area. It concluded that "[g]iven that the airport has been a continuous, long-term, preexisting use, and given the low population density, large lot agricultural and agricultural-residential nature of surrounding land uses, it is unlikely that any new, significant compatibility impacts would occur." The negative declaration stated that the project would not have a significant effect on the environment, and no EIR (environmental impact report) was required.

The Fats challenged the negative declaration during the comment period. They suggested County failed to consider the impact of noise and possible crashes on future residents of adjacent land, and failed to provide for mitigation. County responded that an EIR was unnecessary because "the currently proposed project [did] not result in additional noise or safety impacts beyond those already existing from on-going aircraft operations." It indicated that the existing noise and safety impacts would be mitigated through implementation of standards contained in the Airport CLUP.

The planning commission held public hearings, certified the negative declaration, and approved issuance of the CUP. County recorded the notice of determination. The Fats filed a timely appeal to the board of supervisors.

The board of supervisors conducted public hearings in August and October 1999. The Fats submitted written analyses of project impacts on air quality, noise, and wetlands. Ecologist Kenneth Shawn Smallwood examined the Airport's vernal pools and wetlands. His report addressed both past and future impacts of airport operations. Dr. Smallwood stated: "[T]he project area is rich in wildlife species, supports legally rare species, and provides habitat for multiple additional legally rare species which [he] did not observe during [his] brief visit to the airport. The project destroyed some wildlife habitat and put additional habitat at risk of further destruction due to land conversions and contamination by hazardous substances used for operation and maintenance of aircraft. Individuals of some legally rare species likely have been and will continue to be killed by aircraft during take-off and landings. These impacts have not only been significant, but perpetrated in violation of multiple environmental laws (in the absence of a Use Permit and an EIR). A Negative Declaration was inappropriate for this project. The Use Permit should not have been issued until a reasonable EIR had been prepared. In [his] opinion, an EIR needs to be prepared to assess the impacts of the project and to set forth an effective mitigation prescription for unavoidable impacts."

The board of supervisors denied the Fats' appeal, and certified the negative declaration. It did not determine whether there was preexisting environmental damage. County issued the CUP in October 1999 for a period of five years.

The Fats filed a petition for writ of mandate in superior court. They asked the court to set aside approval of the CUP, and order the Pilots to stop operations at the Airport until the Pilots obtained the requisite permits and complied with all applicable laws, particularly CEQA. They emphasized two arguments in their trial brief. Relying on *Lewis v. Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823 [211 Cal.Rptr. 884] (*Lewis*), the Fats argued that "where there has been no prior CEQA review, . . . the only baseline capable of assuring that no impacts escape evaluation (not to mention mitigation) is 1970, that being the year environmental evaluations began with CEQA's enactment." (Underscoring in original.) They also argued that Dr. Smallwood's biological resources report identified impacts that triggered mandatory findings of significance, and required preparation of an EIR.

At the hearing on the Fats' petition, the trial court expressed concern that the project had developed without the benefit of CEQA review. The court

acknowledged that even if the baseline were set in the early 1970's, it was unsure what the remedy could be. Ultimately, the court ruled that *Lewis* applied, and granted the writ. It ordered that the County not approve another CUP "until the County conducts a CEQA review that analyzes the environmental impacts resulting from the Airport's past from 1970 to the present." The court ruled it unnecessary to reach any other issues in the case.

DISCUSSION

I

■  We begin with a brief description of the legal principles which govern the analysis and review of agency decisions under CEQA. The purpose of CEQA is " 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].) The Legislature intended that "all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage . . . ." (§ 21000, subd. (g).)

To this end, the CEQA Guidelines[3] describe a three-step process to assist a public agency in determining whether a project requires an EIR or negative declaration:

"(1) In the first step the lead agency examines the project to determine whether the project is subject to CEQA at all. If the project is exempt, the process does not need to proceed any farther. The agency may prepare a notice of exemption. . . .

"(2) If the project is not exempt, the lead agency takes the second step and conducts an initial study (Section 15063) to determine whether the project may have a significant effect on the environment. If the initial study shows that there is no substantial evidence that the project may have a significant effect, the lead agency prepares a negative declaration. . . .

"(3) If the initial study shows that the project may have a significant effect, the lead agency takes the third step and prepares an EIR. . . ." (Guidelines, § 15002, subd. (k); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].)

---

[3]The CEQA Guidelines are found in California Code of Regulations, title 14, section 15000 et seq., and are cited here as Guidelines.

The initial study must identify the "environmental setting" before assessing the effect of the project. (Guidelines, § 15063, subd. (d)(2).) The Resources Agency amended section 15125, subdivision (a) of the Guidelines in 1998 to define "environmental setting" as "the physical environmental conditions in the vicinity of the project, *as they exist at the time . . . environmental analysis is commenced,* from both a local and regional perspective. *This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. . . .*" (Guidelines, § 15125, subd. (a), italics added; Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 164.)[4]

■ Where, as here, a party appeals from the superior court's judgment granting a petition for writ of mandate, "the scope and standard of our review are the same as the trial court's, and the lower court's findings are not binding on us. [Citation.] We review the administrative record to determine whether the agency prejudicially abused its discretion. [Citation.] 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th 99, 116-117 (*Save Our Peninsula*).) "In reviewing whether agency procedures comply with CEQA, the test to be applied is 'whether an objective, good faith effort to so comply is demonstrated.' " (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 305 [248 Cal.Rptr. 352] (*Sundstrom*).) "The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. [Citation.]" (*Save Our Peninsula, supra,* at p. 117.) "[A]lthough the agency's factual determinations are subject to deferential review, questions of interpretation or application of the requirements of CEQA are matters of law." (*Id.* at p. 118.)

With these principles in mind, we turn to the specific issue raised in this appeal.

## II

■ The parties agree that section 15125 of the Guidelines sets forth the general rule that environmental conditions existing at the time environmental analysis is commenced "normally" constitute the baseline for purposes of

---

[4]Guidelines former section 15125, subdivision (a) provided: " 'An EIR must include a description of the environment in the vicinity of the project, as it exists before the commencement of the project, from both a local and regional perspective.' " (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 124-125 [104 Cal.Rptr.2d 326].)

determining whether an impact is significant. They also agree that the Legislature's use of the term "normally" gives the agency discretion to deviate from the time-of-review baseline. However, the parties disagree on whether County abused its discretion in using the 1997 baseline in the circumstances of this case. Applying a standard of review that requires us to defer to the County's exercise of discretion if supported by substantial evidence (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 117), we conclude there was no abuse of discretion here.

The briefs filed on appeal cite and attempt to distinguish several cases which address what a popular CEQA treatise describes as "tricky baseline questions." (Remy et al., Guide to the Cal. Environmental Quality Act, *supra,* p. 163; see, e.g., *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307 [31 Cal.Rptr.2d 914] (*Bloom*), and *Lewis, supra,* 165 Cal.App.3d 823; see also *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428 [91 Cal.Rptr.2d 322] (*Riverwatch*).) It is true the cited cases considered the question of baseline for different types of projects at different stages in the three-step CEQA process. Both *Bloom* and *Lewis* involved challenges to categorical exemptions from CEQA review, the first step under section 15002 of the Guidelines. (*Bloom, supra,* 26 Cal.App.4th at p. 1311; *Lewis, supra,* 165 Cal.App.3d at pp. 825, 828.) In *Riverwatch,* the plaintiffs challenged the adequacy of the EIR, the third step in the CEQA process. (*Riverwatch, supra,* 76 Cal.App.4th at p. 1434.) However, these distinctions have little relevance to the question before us because section 15125 of the Guidelines supplies the definition of "environmental setting" against which environmental impacts are measured at each of the three steps in the CEQA process. (See Guidelines, §§ 15063, subd. (d)(2), 15125, subd. (a), 15300.2, subd. (c).) The central issue remains whether there is substantial evidence to support County's decision *not* to deviate from the norm in selecting 1997 as the baseline in the circumstances of the case before us.

Here, County had to decide how to deal with the history of illegal expansion at the Airport. *Lewis* and *Bloom* represent different approaches to the problem of prior illegal activities.

In *Lewis,* a case decided 13 years before the recent amendment to section 15125 of the Guidelines, this court affirmed a judgment ordering cancellation of contracts for auto racing at the Nevada County Fairgrounds. The flat track built in 1958 had been converted to a banked track in 1973 to accommodate higher powered modified stock cars. However, no environmental review was conducted when the track was upgraded. (*Lewis, supra,* 165 Cal.App.3d at p. 826.) We rejected the racing association's contention that the track was categorically exempt from CEQA review as an existing

facility. (*Lewis, supra,* at pp. 825, 829.) The exemption did not apply because, under an exception set forth in section 15300.2, subdivision (c) of the Guidelines, the increased racing activity since 1973 had a significant effect on the environment due to the "unusual circumstances" that the track was located next to a residential area. (*Lewis, supra,* at pp. 828-829.) In his concurring opinion, Justice Blease explained that the categorical exemptions involved categories of projects that "normally do not work an adverse change in the environmental conditions preceding the project." (*Id.* at p. 836 (conc. opn. of Blease, J.).) He stated that as a general proposition, "the conditions of the environment that preceded the project [were] the baseline against which to measure the adverse environmental change." (*Ibid.*) Since there had been no environmental review when the track was modified in 1973, the categorical exemption could not be applied. (*Id.* at p. 838 (conc. opn. of Blease, J.).) The Fats argue *Lewis* is significant because this court was willing to use "a baseline other than time-of-review . . . where environmental impacts would otherwise evade CEQA review and potentially cause ecological harm that [would] go unremedied."

*Bloom* disagreed with the approach taken in *Lewis.* In *Bloom,* the real party in interest, Integrated Environmental Systems, Inc. (IES), had operated as a transporter of hazardous waste since 1982 in an area of Oakland zoned for heavy industry. In 1987, the California Department of Health Services (DHS) accepted IES's application for continued operation as a hazardous waste facility. In 1990, new legislation required IES to obtain hazardous waste permits from DHS, and provide information necessary for DHS to comply with CEQA. DHS designated IES exempt as an existing facility. (*Bloom, supra,* 26 Cal.App.4th at pp. 1309-1310.) The appellate court affirmed the trial court's denial of a petition for writ of mandate to compel DHS to set aside the permits. It held DHS applied the categorical exemption correctly. (*Id.* at p. 1311.) The court cited language in *Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 378, fn. 12 [267 Cal.Rptr. 569, 787 P.2d 976], which called *Lewis* into question. *Bloom* adopted the Supreme Court's interpretation that "the term 'existing facility' in the class 1 exemption would mean a facility as it exists at the time of the agency's determination, rather than a facility existing at the time CEQA was enacted. For purposes of the exception to the categorical exemptions, 'significant effect on the environment' would mean a change in the environment existing at the time of the agency's determination, rather than a change in the environment that existed when CEQA was enacted." (*Bloom, supra,* at p. 1315.) The court presumed "thousands of permits [were] renewed each year for the ongoing operation of regulated facilities, and [discerned] no legislative or regulatory directive to make each such renewal an occasion to examine past CEQA compliance at every facility built in the last 24 years.

That result would contravene the applicable statutes of limitation and the ordinary meaning of the words used in the class 1 exemption." (*Ibid.*) The *Bloom* court also distinguished *Lewis* factually on grounds there was no evidence of "unusual circumstances" such as nearby residential development which would preclude application of the categorical exemption. (*Bloom, supra,* at p. 1316.)

*Riverwatch* addressed the question of prior illegal activity in detail. In that case, the county issued a major use permit for development of a rock quarry, and an association of residents and taxpayers called Riverwatch challenged the adequacy of the EIR. The trial court granted the petition for writ of mandate, and directed the county to vacate its approval of the project. Among other things, the trial court found that the EIR had failed to properly consider the impact of prior illegal activity at the project site. (*Riverwatch, supra,* 76 Cal.App.4th at p. 1434.) The Court of Appeal affirmed in part and reversed in part. (*Id.* at p. 1435.) It disagreed with the trial court that the EIR should have developed an environmental baseline that accounted for prior illegal activity. The Court of Appeal noted that "in general preparation of an EIR is not the appropriate forum for determining the nature and consequences of prior conduct of a project applicant." (*Id.* at p. 1452.) It cited *Bloom* and section 15125, subdivision (a) of the Guidelines in support of the general rule that "environmental impacts should be examined in light of the environment as it exists when a project is approved." (*Riverwatch, supra,* at p. 1453.) The court also acknowledged practical problems in mixing review with enforcement, stating: "[A] particular problem we foresee in requiring an earlier baseline is that definitive evidence of prior illegality will most likely come in the form of the acts of enforcing agencies and that use of an early baseline by a separate agency preparing an EIR may either interfere, conflict or unfairly amplify such enforcement action. [¶] In the absence of more detailed guidance either from the Legislature or the Resources Secretary, we believe a more prudent method of dealing with alleged prior illegality is to rely in the first instance on direct enforcement by the agencies charged with the responsibility of doing so, and second, to rely on such enforcing agencies to comment in the EIR process on the impact any new project may have on their enforcement activities." (*Ibid.*)

In light of the foregoing cases, the amendment to section 15125, subdivision (a) of the Guidelines, and the circumstances of this case, we conclude County did not abuse its discretion in approving the negative declaration and issuing the CUP. First, County followed the required procedures. The initial study represents an objective, good faith effort to comply with CEQA. (*Sundstrom, supra,* 202 Cal.App.3d at p. 305.) It describes the existing environmental setting, and the limited impact of the proposed expansion project.

Second, there is substantial evidence to support the County's decision to use the 1997 baseline under the general rule set forth in section 15125, subdivision (a) of the Guidelines. The area surrounding the Airport remained largely agricultural with a low population density. The ALUC conducted an environmental review of Airport operations in 1992 in connection with a proposed amendment to the Airport CLUP. It adopted a negative declaration, which was not challenged. Although the Airport developed over a period of nearly 30 years without County authorization, there was evidence of environmental damage during that period, and the Airport had been the subject of at least two zoning enforcement actions, the Pilots finally applied for the CUP in 1997 to resolve its lengthy dispute with the County. County could reasonably view the Pilots' application as an opportunity to bring the Airport development under some level of County supervision for the first time.

### DISPOSITION

The judgment is reversed. Defendant and appellant County is awarded its costs on appeal.

Morrison, Acting P. J., and Kolkey, J., concurred.