Filed 1/29/21  Friends of the San Dieguito etc. v. City of San Diego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT
## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF THE SAN DIEGUITO RIVER VALLEY,<br><br>    Plaintiff and Appellant,<br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent;<br><br>SURF CUP SPORTS, LLC,<br><br>    Real Party in Interest and Respondent. | D075654<br><br>(San Diego County<br>Super. Ct. No. 37-2016-00030312-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

The Law Office of Julie M. Hamilton and Julie M. Hamilton, for Plaintiff and Appellant.

Office of the City Attorney, Mara W. Elliott, City Attorney, George F. Schaefer, Assistant City Attorney and Jenny K. Goodman, Deputy City Attorney, for Defendant and Respondent.

Seltzer Caplan McMahon Vitek and G. Scott Williams for Real Party in Interest and Respondent.

INTRODUCTION

Respondent City of San Diego (City) owns a 114-acre parcel of land, about 80 acres of which have been developed into and are known as the Polo Fields, near the corner of El Camino Real and Via de la Valle. The property has long been used for public recreation. It includes a portion of the public Coast to Crest Trail, an equestrian and pedestrian trail along the San Dieguito River. In 2016, the City approved a long-term lease ("2016 Lease" or "Lease") for the land with real party in interest Surf Cup Sports, LLC (Surf Cup). The City determined that approval of the Lease was a project within the meaning of the California Environmental Quality Act (CEQA). (Pub. Resources[1] Code, § 21000 et seq.) It found the project was categorically exempt from CEQA review, and no exceptions applied. The City recorded a Notice of Exemption (NOE) for the Lease.

Friends of San Dieguito River Valley (Friends) filed a petition for writ of mandate challenging that determination by the City. The trial court rejected the Friends' position and ruled in favor of the City and Surf Cup. Friends appeal that decision.

_____

[1]    Further statutory references are to the Public Resources Code unless stated otherwise.

2

BACKGROUND

Watt Industries issued a grant deed to the property to the City in 1983, to be preserved and maintained as open space.[2] The deed contained a restriction, operative until the end of 2044, that the property could be used for passive noncommercial recreational uses, including reasonable support facilities such as parking; and active noncommercial recreational uses "not involving large assemblages of people or automobiles." The deed permitted parking lots to serve the facilities on the property, however.

The City approved a 26-year lease with the Fairbanks Polo Club (Polo Club[3]) in 1986 to construct and operate polo facilities, an equestrian center, polo games and tournaments, horse training and boarding, and affiliated uses. The lease provided that the Polo Club would not allow "large assemblages of people or automobiles." The City conducted an initial study for CEQA review. The 1986 initial study stated the purpose and main features of the lease were to provide a private polo club, which would develop the following facilities: "one 200 X 300 yard polo field, two portable trailers serving as office space and housing for the caretaker, portable corrals and pastures for 140–200 horses, a portable tack room, and two portable restrooms." Future plans for the site include the construction of a club house, an additional polo field, pasture land and additional portable corrals."

---

[2]    We start with the grant deed because, as shown *post*, the allowed uses under the 2016 Lease are those uses that have been allowed by the grant deed and its amendments. We do not opine on the legal validity of the grant deed and its amendments, or on any possible violations of the deed and its amendments. We refer to the deed and its amendments only to define and describe the allowed uses of the property under the current Lease.

[3]    References to the Polo Club include the Rancho Santa Fe Polo Club, successor to the Fairbanks Ranch Polo Club.

The uses also included an unpaved parking area for 50 cars, fencing, and construction of an offsite pipe to provide water from the Santa Fe Irrigation District. Grading of the site would be limited to the clearing of brush. The Environmental Quality Division of the City determined there would be no significant land-use impacts from the lease. Most of the site would be preserved as "natural open space and the proposed low-intensity activity would be in keeping with the outdoor recreational uses intended for this area." The City issued a Negative Declaration for the lease. The Negative Declaration stated that, "The development of future facilities on the site would be subject to subsequent environmental review."

The Polo Club contracted with Surf Cup in 1992 to hold soccer games and tournaments on the property. In 1992, Surf Cup held soccer tournaments on two weekends per year, for three days each, with about 4,400 cars in total for each three-day event. Additional tournaments and other events were added, for generally fewer than 25 days per year in total, with over 25,000 cars each year and upward of 80,000 in attendance, each year, from 1992 through 2016. The Polo Club continued to present polo matches and other events, with estimated average attendance of about 800 people per day. In 2015, 27 days of special events and 13 polo matches were held on the property.

The grant deed was amended in 2002 to permit these increased uses that had been occurring for a decade. The successor to the deed grantor provided written consent to expand the allowed uses on the property to include: dog shows, lacrosse tournaments, soccer tournaments, Christmas tree sales, golf equipment testing; youth soccer practices; and up to, but not more than, six livestock superintendents/groundskeepers living on the site.

4

The grantor specified that these events could occur on no more than 25 days, cumulatively, per year.

The City issued a notice of violation to the Polo Club in 2005 because it had graded a horse exercise track over the existing public Coast to Crest Trail without authorization. The Polo Club obtained a Site Development Permit (SDP) to repair the damage it had caused. The City issued a Mitigated Negative Declaration (MND) in connection with the SDP. The Polo Club moved the exercise track but did not complete the rest of the required repairs. The 2016 Lease states that the SDP is a covenant running with the land and remains to be completed.

The Polo Club's lease term expired in March 2012. The Polo Club continued to possess the land due to holdover provisions in its lease. Before issuing a request for proposals for a long-term lease for the property, the City asked the successor grantor of the deed, Ocean Industries (OI), to expand the permissible use of the property.[4] The City asked OI to approve practice, play, and tournaments for soccer, polo, lacrosse, and other sports; parking; and other ancillary facilities such as restrooms. The City also asked OI to permit up to 25 events per year, with events being defined as consecutive-day sporting/athletic tournaments, in lieu of the previous consent for up to 25 days of events. OI agreed to these uses on November 3, 2014, as requested.

OI later retracted its permission for 25 events per year, and returned to the limitation of 25 days of events per year. The City agreed to "proceed with its use of [the property] pursuant to the terms of the Grant Deed." The 2016 Lease states that the property may be used as permitted by the grant deed

---

[4]  Fairbanks questioned OI's ability to amend the lease, stating that it was no longer the successor grantor. Without opining on that issue, we treat the 2014 amendment and its later modification as defining the scope of the allowed uses of the property.

and its amendments. We therefore assume the Lease permits the activities contained in the 2002 and 2014 amendments, with the limitation of 25 days of events per year, and not 25 multiday events.

On April 28, 2015, the City issued a Request for Proposals to lease and operate the property after the Polo Club's lease term expired. There were three responses. The City reviewed the three proposals and recommended approval of a long-term lease with Surf Cup.

The project, approval of the 2016 Lease with Surf Cup, was described as follows in an environmental review memorandum prepared by Myra Herrmann, a senior planner with the City Planning Department. (Herrmann memo). Herrmann described the existing condition of the property as: "open grassy fields used for recreational activities, existing dirt trails, roads, and parking areas, and dilapidated or aged accessory or appurtenant facilities." She said that the property "has been used for polo, soccer, lacrosse, rugby, and other recreational and special uses since 1986 by [the Polo Club]. . . . [S]ince 1992, the Surf Cup Sports has contracted with [the Polo Club] for ongoing use of the property. [¶] . . . In addition to the continued use for daily youth sports, youth polo instruction and occasional polo matches, the horse drop-off facilities for equestrian users of the Coast to Crest Trail will also be maintained. The Surf Cup proposal also includes partnering with other sports organizations for sports-related special events and other ancillary uses including corporate events and other uses allowable under the deed . . .." The lease proposal contained several actions to be performed by Surf Cup, including: improvement of existing irrigation system and equipment; installation of fencing, gates and signage; replace the turf with new turfgrass and "make improvements to landscaping throughout the property;" improve all existing roads and parking areas; take down barns, stables, temporary

6

storage areas, other structures; replace trailers; remove and replace clubhouse and offices; remove and relocate the maintenance yard and associated structures; remove the equestrian arena; install temporary housing for caretakers; and remove an existing polo scoreboard and billboards. Existing roads and parking areas would be improved with decomposed granite to reduce dust and improve safety, and "[p]arking associated with ongoing and/or continued use of the site would be provided on-site and maintained within existing improved parking areas." Existing or temporary sports storage facilities would be removed and/or replaced with structures that complied with the current municipal code.

Herrmann found that "[a]lthough the property is within the San Dieguito River Valley and in close proximity to adjacent open space, none of the areas where renovations and improvements are proposed support sensitive biological resources that could be affected by the proposal." Herrmann concluded that multiple categorical exemptions applied to the Lease, and the exceptions to the exemptions did not apply. She concluded that neither a Negative Declaration nor an Environmental Impact Report were required by the CEQA Guidelines. (Cal. Code Regs., tit. 14,[5] §§ 15060–15065).

The Smart Growth and Land Use Subcommittee of the City Council reviewed the Surf Cup proposal on June 29, 2016, with a lengthy public discussion of the issue. The committee members forwarded to City Council a recommendation to approve the Surf Cup Lease. City Council members considered the Lease in an open, public meeting on July 25, 2016. The City Council voted eight to one to adopt a resolution authorizing the mayor to

---

[5] Further references to the Guidelines are from Title 14 of the California Code of Regulations.

execute the Lease between the City and Surf Cup. The mayor approved the resolution, and approved an amended resolution on August 3, 2016, after the required statement of market value was added. Also, on July 25, 2016, the City Council adopted a resolution determining that the approval of the Lease was categorically exempt from CEQA and that no exceptions to the exemptions applied. An amended resolution was approved by the Council and the mayor on August 3, 2016.

The City prepared and recorded a Notice of Exemption (NOE). The City signed the Lease on July 25, 2016.

PROCEDURAL BACKGROUND

Friends filed a petition for writ of mandate on August 29, 2016, naming the City as respondent and Surf Cup as a real party in interest. After further proceedings, Friends filed a Second Amended Petition for Writ of Mandate (SAP). The SAP stated four causes of action alleging violations of CEQA, and a fifth cause of action for the City's failure to enforce municipal code requirements. The court sustained a demurrer by City and Surf Cup to the fifth cause of action on August 10, 2018, without leave to amend. That ruling is not being challenged in this appeal.

The court issued a final ruling on the remaining CEQA causes of action on January 30, 2019, denying the SAP in its entirety. Judgment in favor of City and Surf Cup was entered on February 20, 2019.

Friends have timely appealed.

DISCUSSION

A. CEQA and Standard of Review

"The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory

8

language.' . . . . The Legislature has emphasized that 'It is the intent of the Legislature that all agencies of the state government which regulate activities . . . which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage. . . .' (§ 21000, subd. (g).)" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)

"CEQA establishes a three-tier environmental review process. The first step is jurisdictional and requires a public agency to determine whether a proposed activity is a 'project.' . . . If a proposed activity is a project, the agency proceeds to the second step of the CEQA process. [¶] At the second step, the agency must 'decide whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the . . . Guidelines [citations].' . . . [¶] Unlike statutory exceptions, categorical exemptions are subject to exceptions. . . . [¶] If a project is categorically exempt and does not fall within an exception, ' "it is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' " ' " (*Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 291–292.) "[I]f a project is not exempt, the agency must then 'decide whether the project may have a significant environmental effect.' " (*Id*. at p. 292.) "[I]f the project may have a significant effect on the environment, the agency must proceed to the third step of the process and prepare an environmental impact report (EIR)." (*Ibid*.)

On an appeal challenging a trial court's denial of a petition for a writ of mandate in a CEQA case, we independently review the agency's action. (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 257.) We review an agency's CEQA

9

determination for abuse of discretion, as provided in section 21168.5. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1110–1111 (*Berkeley Hillside*).) Under that provision, a court's inquiry is "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) We review the administrative record for substantial evidence supporting an agency's factual determination that a project falls within a categorical exemption or an exception. (*Banker's Hill*, at p. 267.) "In applying the substantial evidence standard of review, all conflicts in the evidence are resolved in favor of the prevailing party and all legitimate and reasonable inferences are made to support the agency's decision. [Citations.] When two or more inferences reasonably can be deduced from the evidence, we cannot substitute our deductions for those of the agency. [Citations.]" (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 410 (*Holden*).)

B. Environmental Review of Project

Approval of the Lease was a project, in accordance with section 21065.[6] (See also Guidelines § 15378, subd. (a)(3); see *San Diegans for an Open Government v. The City of San Diego* (2018) 31 Cal.App.5th 349, 369–371 (*SDOG*) [restated lease was a project that was exempt from CEQA]). The impacts of the project were compared to the existing environmental conditions at the time of the CEQA analysis, including the existing level and intensity of ongoing operations and uses of the property. (*Communities for a*

---

[6] A project is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] . . . [¶] (c) An activity that involves the issuance . . . of a lease . . . by one or more public agencies." (§ 21065.)

10

*Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 321 (*Communities for a Better Environment*); *North Coast Rivers Alliance v. Westlands Water District* (2014) 227 Cal.App.4th 832, 872 (*North Coast Rivers*).) We compare the project with its existing conditions even if the existing conditions do not conform with codes, regulations or law. (*Communities for a Better Environment*, at pp. 321–323, 326–328 [impacts of project to be compared to actual existing environmental conditions, rather than to conditions allowed by a plan or regulatory framework]; *Citizens for East Shore Parks v. State Lands Comm.* (2011) 202 Cal.App.4th 549, 559–560 (*East Shore Parks*); *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277 (*Fat*); *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1433-1434 (*Riverwatch*).)

In *Fat*, for example, the appellate court upheld the agency's evaluation using the current conditions of an airport, even though "the Airport developed over a period of nearly 30 years without County authorization, there was evidence of environmental damage during that period, and the Airport had been the subject of at least two zoning enforcement actions." (*Fat*, *supra*, 97 Cal.App.4th at pp. 1280–1281.) "How present conditions come to exist may interest enforcement agencies, but that is irrelevant to CEQA baseline determinations—even if it means preexisting development will escape environmental review under CEQA." (*East Shore Park*, *supra*, 202 Cal.App.4th at p. 559.)

Thus, we do not compare the impacts of the project to those conditions that existed in 1986 when the City issued a Negative Declaration for the lease to the Polo Club. There was a significant increase in the intensity of uses from 1986 to 2016 without environmental review. Nonetheless, we compare approval of the 2016 Lease to the uses that existed in 2016, even if

11

that significant increase of use was never reviewed for its environmental impact. (*East Shore Park*, *supra*, 202 Cal.App.4th at p. 559.)

A project includes "the whole of an action." (Guidelines, § 15378.) We review the agency's reasonable expectations of the use of the property through the entirety of the 28-year Lease to the extent possible. We are not required to review all actions that may occur over that length of time. Only those actions that are reasonably anticipated or a reasonably foreseeable consequence of the project must be considered when defining the project. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 383 (*Muzzy Ranch*); *Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) The City's preliminary review of the project appropriately included actions that Surf Cup intended to undertake to improve the property.

Friends contend that the City should have considered all changes and improvements that were included in Surf Cup's October 2015 response to the request for proposals and its February 2016 letter of intent. Future actions that are only contemplated need not be considered. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) Friends argue that the City is "piecemealing" the environmental review by failing to consider all the improvements proposed by Surf Cup. Additional improvements beyond those identified in the NOE, however, have not been sufficiently developed to be included in the review. (*Ibid.*)

Further, the letter of intent and response to request for proposals predated a significant change in the uses allowed under the Lease. At the center of this appeal is the claim of Friends that Surf Cup will significantly expand its use of property, specifically by expanding 25 days of events to 25 events per year, of five days each, for up to 125 days of events. Surf Cup sent to the City a letter of intent on February 4, 2016, that anticipated up to 25

12

events of five days each, which would certainly be a significant expansion of use. Twenty-five events in total would have been allowed under the amendment to the grant deed that was in effect at the time of the letter of intent, but permission for that greater use was rescinded by the grantor and the City agreed to this limitation. The intensity of use will not increase under the Lease. Additional projects are also included within the Surf Cup's Capital Improvements included in its response to the request for proposals. Plans for these additional actions are insufficiently developed to be reasonably foreseeable as part of the Lease. Only those acts that were included in the NOE are sufficiently definite to be included as part of the project as described in the NOE. Future actions that are merely contemplated as a possibility need not be included within the project. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) Additional changes to the property and its uses would be subject to future environmental review.

The Lease, therefore, did not significantly expand the intensity of use of the property. It allowed the uses that had been ongoing, including up to 25 days of events throughout the year. The Herrmann memo accurately included those actions that were reasonably anticipated under the Lease, and concluded that the Lease would continue activities at the same level of intensity as in prior years. (See *North Coast Rivers*, *supra*, 227 Cal.App.4th at p. 872 ["Where a project involves ongoing operations or a continuation of past activity, the established levels of a particular use and the physical impacts thereof are considered to be part of the existing environmental baseline"].)

Friends criticize the Herrmann memo as having insufficient detail of the conditions existing at the time of the review. This review, however, was the preliminary review for exemptions. An NOE requires only a brief

13

description of a project, its location, the finding and identification of applicable exemptions, and a brief statement of reasons in support. (Guidelines, § 15062, subd. (a).) Detailed factfinding and explanations are not required. (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 387.) The more extensive description of the environmental setting that is required for an EIR baseline (Guidelines, § 15125) is not required for the preliminary review for exemptions. (See *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1192 [much less detail in description of environmental setting for initial study of environmental impact (Guidelines, § 15063) than in determination of the baseline environmental setting for an EIR (Guidelines, § 15125)].) Friends acknowledge that the record contains ample evidence of the existing conditions and level of use for the property.

C. Categorical Exemptions

The City identified four categorical exemptions in the Guidelines that are applicable to the project: (1) section 15323, for normal operations of facilities for public gatherings; (2) section 15301, for existing facilities; (3) section 15304, for minor alterations to land; and (4) section 15311, for accessory structures. It also determined that the exception for unusual circumstances did not apply. The City further concluded that the exceptions to the categorical exemptions (Guidelines, § 15300.2) did not apply. Substantial evidence supports the City's factual findings that approval of the Lease, with its current and historical uses of the property, are categorically exempt under CEQA, in accordance with the Guidelines.

Categorical exemptions are applied to classes of projects that typically do not have significant effects on the environment because they do not involve adverse changes in the existing environmental conditions. (*North Coast Rivers*, *supra*, 227 Cal.App.4th at p. 851; *Fat*, *supra*, 97 Cal.App.4th at

14

p. 1279.)  The categories applicable here reflect the exemption for projects that continue historic uses:  normal operations of facilities for public gatherings, existing facilities, minor alterations to land, and accessory structures.  Because a project is compared to the existing conditions, a project that continues those existing conditions reflects no adverse changes to the environment.  (See *North Coast Rivers*, at p. 851.)  Substantial evidence supports the City's determination of categorical exemptions because the sports activities and improvements anticipated under the Lease were consistent with the historic uses of the property and thus created no significant change.

Categorical exemptions are subject to exceptions, identified in the Guidelines.  Friends contend that an exception for unusual circumstances applies here.  (Guidelines, § 15300.2, subd. (c).)  "The lead agency has the burden to demonstrate that a project falls within a categorical exemption and the agency's determination must be supported by substantial evidence." (*Citizens for Environmental Responsibility v. State ex. rel. 14th District Agricultural Assn.* (2015) 242 Cal.App.4th 555, 568 [*Citizens for Environmental Responsibility*].)  A determination that a categorical exemption applies must include a finding that none of the exceptions identified in the Guidelines are applicable.  After an agency finds a categorical exemption, the burden then shifts to the challenging party to produce evidence showing that one of the exceptions applies to take the project out of the exempt category.  (*Ibid*.)  We review the City's finding of categorical exemptions before determining whether any of the exceptions apply.  (*Id.* at pp. 572–573.)

We apply the substantial evidence standard in reviewing an agency's factual determination that a project falls within a categorical exemption,

resolving all conflicts in favor of the agency and drawing all reasonable inferences that support the agency's decision.  (*Holden*, *supra*, 43 Cal.App.5th at p. 410.)

              1.  <u>Normal Operations of Facilities for Public Gatherings—</u> <u>Guideline Section 15323</u>

Guideline section 15323 provides an exemption that extends to normal operations of facilities designed for public gatherings, for which the facility was designed, where there is a history of the facility having been used for the same or similar kind of purpose for at least three years, with a reasonable expectation that the future occurrences at the facility would not represent a change in the operation of the facility.

The categorical exemption for "normal operations" of public gathering facilities thus has several elements:  (1) normal operations of existing facilities for public gatherings for which the facilities were designed, (2) with a past history of being used for the same or similar purpose for at least three years, and (3) where there is a reasonable expectation of no change in the future.  (Guidelines, § 15323; see *Citizens for Environmental Responsibility*, *supra*, 242 Cal.App.4th at p. 573.)  "Normal operations" are the events and activities that were put on and the internal operations used to facilitate those events.  (*Citizens for Environmental Responsibility*, at p. 573.)  In *Citizens for Environmental Responsibility*, the agency found a rodeo was exempt under this category and issued an NOE because the rodeo was "indistinguishable from other livestock and equestrian events held at the Fairground for many, many years."  (*Id*. at p. 573.)  There were no more horses and cattle than had been present at prior events.  (*Id*. at pp. 561, 564–565.)  The operations were similar in type and scope to other events at the fairgrounds over the years.  (*Ibid*.)

16

Substantial evidence shows that the existing facilities here have been used for soccer and lacrosse tournaments, polo matches, and assorted other events, primarily sports events, for much longer than three years. A chart summarizing the events other than polo that have occurred on the property from 1992 through 2016 showed consistent historic usage of the property. City staff presented a graph to City Council showing consistent levels of people and cars on the property for that time period. The allowable uses under the Lease were indistinguishable from the past uses. The grant deed and its amendments, incorporated into the Lease, permit the same uses on the property and do not permit the multi-day events to increase beyond 25 days per year. Future operations would not represent a change in the operation of the facility.

Friends argue that this exemption does not apply because the property was not originally designed for the amount of use that existed in 2016. Friends compare the uses allowed under the Lease to the uses originally allowed in the grant deed and the conditions existing at the time of the Polo Club lease in 1986. Friends rely on a concurring opinion in *Lewis v. 17th District Agricultural Association* (1985) 165 Cal.App.3d 823, 829 (*Lewis*) to contend that this normal-operations category "exempts [only] uses which have already been evaluated in the review of the permit for the facility." (*Lewis*, at p. 836 [Blease, J., concurring] [use of "for which the facilities were designed" in normal-operations exemption implies purpose of *preventing duplication of evaluation* when facility was first designed].) Subsequent cases, however, have made clear that a project must be compared to the conditions existing at the time of the environmental review, even if those conditions were never reviewed under CEQA and even if the current conditions were never permitted. (*East Shore Parks*, *supra*, 202 Cal.App.4th

17

at pp. 559–560; *Fat*, *supra*, 97 Cal.App.4th at p. 1277; *Riverwatch*, *supra*, 76 Cal.App.4th at pp. 1433–1434; see also *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1315 [disagreeing with *Lewis* and calling its ruling into question].)  In any event, the *Lewis* case did not conscribe the normal-operations exemption, because its finding of administrative discretionary error was based on the "unusual circumstances" exception to categorical exemptions.  (See *Lewis*, at p. 829; see also *Citizens for Environmental Responsibility*, *supra*, 242 Cal.App.4th at p. 585 [explaining and distinguishing *Lewis*].)

In light of the requirement to compare the project with the existing conditions, we consider the design of the facilities at the time the City made its environmental determination in 2016.  (*Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 320–323, 326–328; *Fat*, *supra*, 97 Cal.App.4th at p. 1277.)  The property was designed and used for multiple sports games and tournaments at the time that the City found the normal-operations categorical exemption to be applicable.

Friends assert there is not a history of the property being used in the same or similar way, based on its faulty premise that 25 multiday events, or up to 125 days of events, are permitted under the 2016 Lease.  As explained above, that expanded use of the property was retracted and the City agreed to limit use of the property under the Lease to its historical uses.  The staff report for the project, and the staff description of the Lease to the City Council stated that the Lease was limited to historical purposes.  Substantial evidence supports the City's finding that the Lease was categorically exempt because it permitted the continued normal operations of the property, which was designed for sports play, practice and competitions, with a history of having been used for the same or similar activities and a reasonable

18

expectation that increase in intensity of use was not permitted under the Lease.

## 2. Existing Facilities—Guidelines § 15301

Guidelines section 15301 provides an exemption from environmental review for the "operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. . . . The key consideration is whether the project involves negligible or no expansion of use." (Guidelines, § 15301.) The "existing facilities" are those that exist at the time the agency makes its CEQA determination. (*SDOG*, *supra*, 31 Cal.App.5th at p. 371.) Some examples of the operations, repairs and maintenance that are permitted by this guideline include: "(c) Existing highways or streets [and] trails and similar facilities (this includes road grading for the purpose of public safety, and . . . other similar alterations that do not create additional automobile lanes. [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety . . . . [¶] . . . [¶] (h) Maintenance of existing landscaping [and] native growth. . . . [¶] . . . [¶] (*l*) Demolition and removal of individual small structures listed in this subdivision: [¶] . . . [¶] (3) . . . small commercial structure if designed for an occupant load of 30 persons or less; (4) Accessory (appurtenant) structures. . . ." (Guidelines, § 15301.)

Many of the actions listed in the NOE fall into this category: demolition and removal of accessory structures and small commercial structures, i.e. the barns, stables, temporary storage areas, trailers, clubhouse, offices and other structures; removal of the equestrian arena, polo scoreboard and billboards; replace turf with turfgrass and improvements to

19

landscaping; and maintenance of the existing roads and parking areas. Continuing refurbishment, renovation and repair to existing roads, buildings and landscape are included within this guideline. (*SDOG*, *supra*, 31 Cal.App.5th at p. 371.)  The small structures that were being replaced— trailers, clubhouse, offices, and installation of temporary housing—were exempt under Guidelines section 15303, new construction or conversion of small structures, although neither the environmental review nor the NOE specifically identify that exemption.[7]

### 3.  Minor Alterations to Land—Guidelines § 15304:

This category exempts "minor public or private alterations in the condition of land, water, and/or vegetation which do not involve the removal of healthy, mature, scenic trees."[8]  (Guidelines, § 15304.)  Examples of the sorts of activities covered by this exemption include but are not limited to: "(a) Grading on land with a slope of less than 10 percent, except that grading shall not be exempt in a waterway, [or] in any wetland . . . .  [¶]  (b) New gardening or landscaping . . . [¶] . . . [¶]  (e) Minor temporary use of land having negligible or no permanent effects on the environment, including carnivals, sales of Christmas trees, etc."  (*Ibid.*)

---

[7]    Failure to include a specific exemption in the NOE does not preclude later reliance on that exemption, as the only purpose of the NOE is to start the running of the statute of limitations.  (*California Farm Bureau Federation v. California Wildlife Conservation Board* (2006) 143 Cal.App.4th 173, 190–191 (*Farm Bureau Federation*).)

[8]    We exclude from this discussion the improvement work on the Coast to Crest Trail, because the City has already issued an MND and an SDP to repair the trail and restore wetland habitat.  The City determined that the MND adequately covered the portion of the Trail that was included in the 2016 Lease property, and no additional environmental review was necessary.

Surf Cup proposes to replace existing turf with new turfgrass and make "improvements to existing landscaping throughout the property," to "remove any unsafe non-native trees and foliage." Parking will be "maintained within existing improved parking areas." These acts are all confined to the area already developed and existing, which does not include any of the sensitive habitat that exists on the undeveloped portions of the property. The Herrmann memo states that "none of the areas where renovations or improvements are proposed support sensitive biological resources that could be affected by the proposal."

Friends claim that sports tournaments are not comparable to the carnivals and Christmas tree lots that are included in this exemption. (Guidelines, § 15304, subd. (e).) The existing sports tournaments are part of the existing environment and uses at the time of the CEQA review. (*Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 321–322; *North Coast Rivers*, *supra*, 227 Cal.App.4th at p. 872.) The history shows that thousands of cars have traveled to the site each year and parked, and the Lease allows only the same intensity of usage as has historically occurred. Expanded tournaments are not permitted under the Lease, which continues the existing use of 25 days of events only.

Any grading that occurs with the improvement of existing roads and parking areas is exempt under this category. The minor-alterations-to-land category includes grading, even when fill is imported, unless the challenger can show that the environmental impact of the grading and fill "is so significant that it is not a minor alteration." (*Madrigal v. City of Huntington Beach* (2007) 147 Cal.App.4th 1375, 1386.) In *Madrigal*, the agency found that a grading permit for an entire parcel, including elimination of areas of

21

flooding by scraping and filling, was exempt from CEQA review under this exemption. (*Id.* at pp. 1379, 1385–1386.)

Grading the roads and parking lots will occur within the parts of the property that have already been developed, and is exempt under this category. The City stated that parking would be "maintained within existing improved parking areicas." The record shows that thousands of cars have traveled to the property on a fairly consistent basis from 1992 through 2016. The record is not clear where all those cars parked or about the amount of parking on the property that existed in 2016. Friends have not identified evidence in the record that contravenes the City's factual finding about parking on the property. The intensity of use will not be increased under the Lease. We accept the agency's
decision when the evidence conflicts and draw all reasonable inferences in support of the agency's decision. (*Holden*, *supra*, 43 Cal.App.5th at p. 410.)

Friends contend that because the property is in a floodplain it is "wetlands or a waterway" as used in Guidelines, section 15304, subdivision (a) ["grading shall not be exempt in a waterway, [or] in any wetland"].) A waterway is a course of flowing water. The area used for playing fields is not in the wetlands of the San Dieguito River. There is a 100-foot buffer that starts at the edge of the wetlands. Parts of that buffer have been developed and used in the past, and that historic use will continue. Some grading will occur within the 100-foot buffer for the wetlands, but the City determined that these historic uses did not create any adverse environmental impacts on the biological resources in the adjacent wetland habitat. Friends also argue that replacement of all the turf on the property "will be a major alteration to the land," but do not show how that would have a significant adverse effect on the property.

22

Activities that have been found not exempt under this minor-land-alterations category involved dramatic changes to the topography of the land. The exemption was not applicable to a project improving wetlands that involved landscape changes over multiple acres, including changing the height and slope of existing levees, construction of new levees, swales, channels, the creation of semi-permanent ponds on 15 acres of land, and other changes to the land, in *Farm Bureau Federation*, *supra*, 143 Cal.App.4th at page 192. Improvements to existing, developed landscape are not comparable to the changes in topography at issue in *Farm Bureau Federation*. Substantial evidence supports the finding that the foreseeable activities under the lease are exempt under the minor-alteration-of-land exemption, and Friends have not rebutted that factual finding.

4. Accessory Structures—Guidelines, Section 15311

The accessory-structures exemption applies to "construction, or placement of minor structures accessory to (appurtenant to) existing commercial, industrial, or institutional facilities, including but not limited to" signs, small parking lots, and temporary-use items such as mobile food units, portable restrooms "or similar items in generally the same locations from time to time in publicly owned parks, stadiums, or other facilities designed for public use." (Guidelines, § 15311.) This guideline does not cover all the foreseeable actions under the Lease, but does create an exemption for the placement of office trailers, mobile food units, restrooms for the public, and other accessory structures, as for storage of equipment for landscape maintenance, sports and events. Maintenance and improvement of the roads and parking lots are covered under the other exemptions.

The 2016 Lease permits incidental support facilities for the soccer, polo, lacrosse, and other sports practice, play, competition and tournaments that

23

were historically permitted for the property. Substantial evidence supports the City's finding that construction, improvement and placement of these structures accessory to the existing facilities are minor, and exempt under this category.

Combined with the other exemptions, substantial evidence supports the City's factual determination that the reasonably foreseeable activities permitted on the property under the 2016 Lease did not involve a significant change in the existing environmental conditions or uses of the property.

D. Exception for Unusual Circumstances

Friends contend that the "unusual circumstances" exception to the categorical exemptions applies here. Guidelines section 15300.2, subdivision (c), provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*." (Italics added.) The City determined that this exception did not apply.

"In assessing whether the unusual circumstances exception applies, we engage in two alternative analyses, as delineated by our Supreme Court in [*Berkeley Hillside*, *supra*, 60 Cal.4th at page 1105]. 'In the first alternative, . . . a challenger must prove both unusual circumstances and a significant environmental effect that is due to those circumstances. In this method of proof, the unusual circumstances relate to some feature of the project that distinguishes the project from other features in the exempt class.' [Citation.]" (*Walters v. City of Redondo Beach* (2016) 1 Cal.App.5th 809, 819.) "Whether the project presents unusual circumstances under this alternative is a factual inquiry subject to the traditional substantial evidence standard of review," accepting all inferences that support the agency's determination. (*Id*. at p. 820.) If the agency finds an unusual circumstance exists, then it

24

determines if there is a reasonable possibility of a significant effect, due to that circumstance. (*Berkeley Hillside*, at p. 1105.)

"In the second alternative under *Berkeley Hillside*, a challenger 'may establish an unusual circumstance with evidence that the project *will have* a significant environmental effect.'" (*Walters*, *supra*, 1 Cal.App.5th at p. 820, quoting *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) To meet this standard, the challenger must establish a significant environmental effect to a certainty. A possibility or fair argument that the project would have a significant environmental effect is not sufficient. (*Walters*, at p. 820; *Citizens for Environmental Responsibility*, *supra*, 242 Cal.App.4th at p. 576.)

The Guidelines do not define what constitutes an unusual circumstance. The Supreme Court in *Berkeley Hillside* said that a party can show an unusual circumstance by demonstrating that the project has some characteristic or feature that distinguishes it from others in the exempt class, such as its size or location. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105; accord, *Voices for Rural Living v. El Dorado Irrigation Dist.* (2012) 209 Cal.App.4th 1096, 1109 [" 'whether a circumstance is "*unusual*" is judged relative to the typical circumstances related to an otherwise typically exempt project' "].) Friends have not compared approval of the Lease to other projects in the four exempt categories relied on by the City. Failure to compare the project to others in the exempt classes was one of the reasons for finding no unusual circumstances in *Citizens for Environmental Responsibility*, *supra*, 242 Cal.App.4th at pages 577–578 [no comparison to other projects in class of normal operations of public gatherings, Guidelines, § 15323].)

The agency's finding whether an unusual circumstance exists or not is a factual determination subject to the substantial evidence rule. (*Walters*,

*supra*, 1 Cal.App.5th at p. 820.) The challenger bears the burden of demonstrating that the agency's determination was not supported by substantial evidence in the record. (*North Coast Rivers*, *supra*, 227 Cal.App.4th at p. 851.)

### 1. *Zoning and Planning*

Friends contend that the zoning and surrounding land uses are an unusual circumstance that creates an exception to the categorical exemptions. Consistency with surrounding zoning and land use tends to show that unusual circumstances do not exist. (*Citizens for Environmental Responsibility*, *supra*, 242 Cal.App.4th at p. 586.) Friends claim that the allowed uses under the Lease do not comply with the Agricultural and Open Space zoning for the property, creating an unusual circumstance for this Lease. At the City Council hearing, however, a supervisor from the City's Real Estate Asset Department said that the site's Agricultural and Open Space zoning permitted the recreational uses of the property that had been ongoing to date. Further, the request for proposals called for activities, programs and operations consistent with the property's historical uses, grant deed, and zoning.

Friends do not dispute that the uses are permitted under the zoning regulations, but contend that Surf Cup had to obtain conditional use permits for its activities within those zones. The trial court earlier ruled that Friends could not compel the City to require conditional use permits for Surf Cup's actions in this proceeding. Friends did not appeal that decision. (See also *East Shore*, *supra*, 202 Cal.App.4th at p. 559 [land use regulation violations are not relevant to CEQA review].) We do not consider the necessity of conditional use permits but accept the representation of the City supervisor that the property's zoning permitted the activities allowed under the Lease.

26

Friends have not established that the property's zoning was an unusual circumstance.

### 2. *Surrounding Land Uses*

Relying exclusively on *Lewis*, *supra*, 165 Cal.App.3d 823, Friends contend that "the proximity of the residences to a major sporting facility is an unusual circumstance."[9] Friends provide no support for this claim other than its reference to *Lewis*. Friends have provided no comparison of this characteristic—proximity of residences to a major sporting facility—to other projects in the same exempt classes. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) Reference to that single case is not sufficient to rebut the factual finding of the City that the proximity of residences to the project was not an unusual circumstance here.

### 3. *Proximity to Environmentally Sensitive Habitat*

Friends also contend that an unusual circumstance exists because the property contains sensitive habitat. Proximity to environmentally sensitive habitat, alone, does not constitute an unusual circumstance. (See *Citizens for Environmental Responsibility*, *supra*, 242 Cal.App.4th at pp. 581–584 [examples].) The agency must determine if the proximity is likely to cause a significant environmental effect. Friends have shown that environmentally sensitive habitat exists on the property, outside the developed and used

---

9    Friends provided no citation to the record that shows the proximity of residences to the property. We could deem this argument waived and strike this portion of the brief because Friends failed to provide citations to the record supporting the assertion of proximity of residences to the property. (*Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 740–741.) Assertions of fact set forth in an appellate brief must be supported by a citation to the part of the record where that fact appears. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Sky River*, at pp. 740–741.)

    We address the argument, however, for completeness. Photographs in the record show residences near the property.

27

areas, but they have not shown that this proximity is likely to *cause* a significant negative effect on the project. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) The *Berkeley* court held that a potentially significant adverse effect is not alone sufficient to trigger the unusual circumstance exception, as that would "give no meaning to the phrase, '*due to* unusual circumstances.'" (*Id.* at pp. 1097–1098, italics added, quoting Guidelines, § 15300.2, subd. (c).) "Due to" requires a causal effect between the unusual circumstance and the significant environmental effect. Friends must show the proximity to sensitive habitat by itself somehow causes an adverse environmental effect. The possibility of future land use violations, such as those caused by careless grading, are not sufficient to trigger environmental review. (See *Friends of Riverside's Hills v. City of Riverside* (2018) 26 Cal.App.5th 1137, 1153 (*Friends of Riverside's Hills*) [possible future violations are not a basis for environmental review].)

The City's environmental review acknowledged that the property is close to open space and within the San Dieguito River Valley, but found that the areas where renovations or improvements were proposed did not support sensitive biological resources that could be affected by the proposal. Substantial evidence supports this finding. In 1986, the City declared that the lease to the Polo Club would "not have a significant environmental effect." The initial study for the negative declaration in 1986 said that the site was "covered with low-growing non-native and naturalized vegetation characteristic of disturbed agricultural land," and that "no sensitive habitats would be affected" by the 1986 lease. The property has been used in the same or similar way, with increased intensity, since the initial development of the grass fields and polo facilities. The alterations and improvements anticipated as part of the Lease are in the areas that have already been developed.

28

Despite the increased intensity of usage from 1986 through 2016, the normal operations of the property did not disrupt sensitive biological resources. Endangered species, the least Bell's vireo and the light-footed clapper rail, nested in the wetlands at the time of the 2011 MND and SDP to repair the Coast to Crest Trail.

The City agreed to implement a buffer of 100 feet from the edge of the wetlands as mitigation. The buffer included the public trail, some parts of the grass fields and parking. The U.S. Fish and Wildlife Service expressed concern about the effect of noise from the tournaments on endangered species, but the City noted that although the existing sports uses within the buffer and the property as a whole had increased since 1986, the increased use in 2011 had "not had detrimental effects on the nesting or foraging quality habitat in the [San Dieguito] river system to the south" for the least Bell's vireo and light-footed clapper rail. Thus, the continuation of historic uses within the buffer would not create any new edge effects to the species of the adjacent wetland habitat. Restoration of the trail pursuant to the SDP would have beneficial effects for these species.

A City biologist issued a memorandum on July 19, 2016, just days before the City approved the Lease,[10] describing a disturbance that occurred while an existing road was being graded. Vegetation was cleared and fill was placed on other vegetation. This area was "dominated by non-native, invasive species," but was between coastal sage habitat and wetlands. The biologist also stated the construction occurred during the breeding season for endangered species, and the noise "could be considered an indirect impact" to

---

[10] Surf Cup's response that the violation was caused by the Polo Club is disingenuous, as Surf Cup entered into a joint management agreement with the Polo Club in 2015.

protected species. She concluded that "[t]he work performed on the property has resulted in impacts to sensitive biological resources that are considered to be Environmentally Sensitive Lands," because dirt had been pushed onto a slope where the Coast to Crest Trail MND required seeding with coastal sage scrub to replace the non-native plants. Also, the loose dirt could result in the erosion of excess sediment into the adjacent wetlands. Removing the loose fill would remediate the problem.

Friends have shown that there are sensitive biological resources within the property, but they have not shown that the proximity of those resources are reasonably likely to cause significant adverse environmental effects with the approval of the 2016 Lease. The Lease continues the uses that have occurred on the property for more than a decade, with no significant increase of use. The environmentally sensitive habitat will remain undisturbed with the continuation of historic uses allowed under the Lease.

Because there were no unusual circumstances when compared to other projects in the same classes of categorical exemptions, we need not continue to the second step of reviewing whether there was a reasonable possibility of a significant adverse effect caused by the unusual circumstance. (See *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1115.)

Friends compare this case to the circumstances in *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1199.) The project in *Azusa* was the reopening of an 80-acre unlined municipal solid waste landfill that was on top of a large underground water reservoir. (*Id.* at pp. 1175–1176, 1178.) The plan was to deposit 3.2 million tons of municipal solid waste into the pit over a seven-year period. (*Id.* at p. 1176.) The court concluded that numerous circumstances were unusual in comparison with "existing facilities in general" (*id.* at

30

p. 1207), including the circumstance that large-scale disposal of municipal waste was not entitled to any exemption; waste disposal landfills differ from other types of existing facilities; the landfill did not have the safeguards needed to protect the environment; and landfills in general and this landfill in particular posed substantial environmental hazards (*id*. at pp. 1207–1208). Rather than helping Friends, *Azusa* shows the types of circumstances that are truly unusual. There are no such unusual circumstances here.

Friends argue in their reply brief, but not in their opening brief, that the second alternative under *Berkeley* applies: that there will be, to a certainty, significant adverse effects on the environment as a result of the Lease. (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1105; *Walters, supra*, 1 Cal.App.5th at p. 820.) We need not consider arguments raised for the first time in a reply brief on appeal, absent good cause for failure to bring them earlier. (*Nordstrom Commission Cases* (2010) 186 Cal.App.4th 576, 583.) In any event, Friends claim that road and parking grading in the wetland buffer are anticipated in the NOE, and rely on the City biologist's opinion that loose fill from the grading "could result in the erosion of excess sediment into the adjacent wetlands." This potential problem does not create a significant adverse effect because it can be corrected by clearing out the loose fill. An error in the grading is not evidence that there will be, to a certainty, significant adverse environmental effects. (See *Friends of Riverside's Hills, supra*, 26 Cal.App.5th at p. 1152.) As discussed *ante*, continuing historic uses in the 100-foot buffer would not change the environmental effects of those historic uses on the existing biological resources.

Friends have not rebutted the City's finding that the unusual circumstance exception was not applicable.

31

DISPOSITION

The judgment is affirmed.  Costs on appeal awarded to respondents City and Surf Cup.

BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


GUERRERO, J.